CARA GAGLIANO (SBN 308639)
AARON MACKEY (SBN 286647)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333
Email: cara@eff.org

STEPHANIE KRENT (*Pro Hac Vice* motion forthcoming)
ALEX ABDO (*Pro Hac Vice* motion forthcoming)
KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
Tel.: (646) 745-8500
Email: stephanie.krent@knightcolumbia.org

MARIA DEL PILAR GONZALEZ MORALES (SBN 308550)
SHUBHRA SHIVPURI (SBN 295543)
SOCIAL JUSTICE LEGAL FOUNDATION
523 West 6th Street, Suite 450
Los Angeles, CA 90014
Tel.: (213) 973-4063
Email: pgonzalez@socialjusticelaw.org

*Attorneys for Plaintiffs A.B.O. Comix, Kenneth Roberts, Zachary Greenberg, Ruben Gonzalez-Magallanes, Domingo Aguilar, Kevin Prasad, Malti Prasad, and Wumi Oladipo*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

A.B.O. Comix, Kenneth Roberts, Zachary Greenberg, Ruben Gonzalez-Magallanes, Domingo Aguilar, Kevin Prasad, Malti Prasad, and Wumi Oladipo,

Plaintiffs,

v.

County of San Mateo and Christina Corpus, in her official capacity as Sheriff of San Mateo County,

Defendants.

Case No.: 3:23-CV-1865-JSC

**AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATION OF ARTICLE I, SECTIONS 2 AND 13 OF THE CALIFORNIA CONSTITUTION**

## INTRODUCTION

1. This case challenges San Mateo County's policy of digitizing and then destroying mail sent to people in its jails—depriving them of physical letters, drawings, pictures, and mementos—and of conducting suspicionless surveillance of that mail and the individuals who send it. In 2021, San Mateo County banned people in its jails from receiving any physical mail other than attorney communications. Under this new policy, the senders of mail must route their letters to Smart Communications, a private for-profit company based in Florida, where the company scans the mail, destroys it, and stores a digital copy for a minimum of seven years. Through this service, called MailGuard, people in jail may access digital copies of their mail only if they agree to MailGuard's terms of use, and only through shared tablets and kiosks that must be used in public spaces. Smart Communications stores the digital copies in a database that gives the County unfettered access to every piece of mail received.[1]

2. San Mateo County's policy banning physical mail and subjecting digital copies to long-term surveillance violates the expressive, associational, and privacy rights of the individuals in its jails, including those presumed innocent, and of the many individuals who send mail to those incarcerated people. Banning physical mail deprives incarcerated people and their communities of a uniquely expressive form of communication: Physical mail allows people to express themselves in ways that may feel too personal or sensitive for other modes of communication; it encourages deeper connection by giving correspondents the space to read and reflect before responding; and it evokes stronger and more lasting emotional meaning than digital correspondence. Under the County's policy, incarcerated people often struggle to access even digital copies of their mail. The policy also subjects both the senders and recipients of mail to increased and unwarranted surveillance by San Mateo County and others. At the same time, the policy serves no legitimate penological purpose but instead undermines the community and familial ties necessary for successful reentry.

[1] This complaint refers to both Defendants collectively as "San Mateo County" or "the County."

3. Plaintiffs Kenneth Roberts, Ruben Gonzalez-Magallanes, Domingo Aguilar, and Kevin Prasad are among the approximately 1,000 individuals incarcerated in San Mateo County for whom physical mail was once a lifeline, connecting them to loved ones, educators, and religious advisors. They held letters and drawings that their loved ones also held, and they frequently re-read mail in the privacy of their cells, when they awoke in the morning or before falling asleep. Many in the County's jails also relied on physical mail to take correspondence courses, because the physical copies allowed them to annotate readings, fill out worksheets, and send completed coursework back to their instructors.

4. Now, they have difficulty accessing even digital copies of their mail. Those who agree to MailGuard's terms of use can access their mail only on shared tablets and kiosks, only in public spaces, and only during limited recreational time. They may have as little as thirty minutes of recreational time each day, during which they engage in other activities as well, including showering, exercising, and calling home. They cannot review correspondence in the privacy of their cells; they cannot spend any significant amount of time reading and reflecting on the letters they receive; and they cannot easily return to their correspondence. The tablets are also plagued by technical problems that can prevent them from reading their mail at all.

5. Plaintiff A.B.O. Comix is one of the many organizations dedicated to supporting and sustaining incarcerated people. It is a collective of artists that works to amplify the voices of incarcerated LGBTQ people through artistic expression. A.B.O. Comix relies on mail to communicate with incarcerated people about their artistic projects, to circulate newsletters with interactive storytelling prompts, to connect people in prisons and jails with penpals, and to send holiday cards as signs of love and support. These efforts have been hampered by restrictive mail policies, including San Mateo County's policy of destroying and digitizing mail.

6. Plaintiff Malti Prasad has a son incarcerated in San Mateo County, and she has also been denied an important form of protected expression. She used to send handwritten letters and religious and educational materials to her son in jail. But the County put an end to this type of expression. Now, she must send any mail to Smart Communications, which will destroy the mail after scanning it into a digital facsimile drained of much of its sentiment. Shortly after the County

banned physical mail, Ms. Prasad made the difficult decision to stop sending mail to the County's jails, and has been forced to rely on alternatives that are less personal, less private, less easily accessible, and more costly.

7. When this lawsuit was filed, Plaintiff Zachary Greenberg was incarcerated in San Mateo County. He and his significant other, Plaintiff Wumi Oladipo, have been and are still being harmed by the County's ban on physical mail. Prior to the County's adoption of that policy, Mr. Greenberg and Ms. Oladipo would send each other encouraging letters, often using mail to play tic tac toe or complete crossword puzzles. But after the County adopted MailGuard in April 2021, the two became uncomfortable with the surveillance of their correspondence and eventually decided to stop communicating via mail. In April 2023, after this lawsuit was filed, Mr. Greenberg was transferred to state prison, but, on information and belief, digital copies of all mail sent by Ms. Oladipo or anyone else to Mr. Greenberg since April 2021 remain accessible to the County.

8. The County's digitization and long-term storage of correspondence through MailGuard enables sophisticated and invasive surveillance of both incarcerated and nonincarcerated people. Every piece of mail sent through MailGuard goes into a database that is searchable through a dashboard Smart Communications maintains for San Mateo County. The County has given access to this dashboard to all law enforcement officers in San Mateo County's corrections division, to investigators in its sheriff's office and district attorney's office, and to investigators in other municipalities in the County. These individuals can read and search mail through the dashboard without the need for individualized suspicion of wrongdoing, and without providing notice to either the sender or the recipient that their mail has been read or searched. On information and belief, County officials can specify keywords of their choosing and receive alerts any time a piece of mail contains one of those keywords. Finally, County officials can access the additional sensitive information that Smart Communications collects from individuals who send mail to the County's jails and sign up for its mail tracking service. This surveillance has predictably deterred many, including members of A.B.O. Comix, from writing as freely about sensitive topics, and has deterred others, including Ms. Oladipo and Ms. Prasad, from sending mail into the County's jails at all.

9. While officials are entitled to some deference in administering jails and prisons, their policies must comply with the protections of Article I of the California Constitution. Here, San Mateo County's mail policy serves no legitimate penological purpose. Although the County's then-Sheriff, Carlos Bolanos, announced that the County's mail policy was meant to "prioritize . . . safety and security," the County has never explained why it initiated sweeping and long-lasting surveillance of both incarcerated and nonincarcerated people. And it has not justified its decision to ban mail over concerns about "fentanyl exposures." On information and belief, mail is not a significant source of fentanyl or other drugs in San Mateo County's jails, and there is broad expert consensus that incidental fentanyl exposure does not pose a health risk.

10. Rather than further the County's goals, the mail policy undermines the County's penological interests in successful reentry. Numerous studies have confirmed that greater community and familial connection throughout incarceration, including through letter-writing, is associated with better post-incarceration adjustment. San Mateo County's mail policy, however, impedes expression and association during incarceration, threatening the important penological interests in, and sociological benefits of, correspondence by mail.

11. Finally, the County's mail policy also impedes religious correspondence. Religious and spiritual practices are central to the lives of many incarcerated people, including Mr. Greenberg, Mr. Gonzalez-Magallanes, and Mr. Prasad. Mail was an important source of religious material, especially because of the difficulty of accessing religious guidance from jail services directly. Mail also allowed people to maintain individual spiritual practices by studying, meditating on, and sharing printed prayers, images, and religious instruction as they saw fit. The loss of physical religious correspondence has made it substantially more difficult for incarcerated people to freely communicate about and further their religious practices.

12. Plaintiffs now seek declaratory and injunctive relief from San Mateo County's mail policy. As described further below, San Mateo County's elimination of physical mail and use of MailGuard violates Article I, Section 2 of the California Constitution by denying Plaintiffs and others the ability to use a uniquely expressive medium of communication and by chilling their expressive and associational activity. The policy also violates Article I, Section 13 of the California

Constitution because it involves the search and seizure of correspondence and other information about the senders of mail for subsequent investigative use without any suspicion of wrongdoing, in a manner that is unreasonable at its inception and in its scope and duration.

**JURISDICTION AND VENUE**

13. When this matter was removed to federal court, this Court had subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1367, and venue was appropriate under 28 U.S.C. § 1446(a) because the Superior Court of San Mateo County is located in the Northern District of California.

14. The Superior Court of San Mateo County also has jurisdiction over Plaintiffs' claims under California Code of Civil Procedure §§ 525, 526a, and 1060. Venue is proper in the Superior Court of San Mateo County pursuant to California Code of Civil Procedure §§ 393(b), 394(a), and 395(a) because Defendants are located in San Mateo County and their actions giving rise to Plaintiffs' claims occurred in San Mateo County.

**PARTIES**

15. Plaintiff A.B.O. Comix is a collective of artists that works to amplify the voices of LGBTQ prisoners through artistic expression. It is based in Oakland, California. Its staff have sent mail to at least one individual incarcerated in San Mateo County's jails, and have paid California sales tax within the past year.

16. Plaintiff Kenneth Roberts is currently incarcerated in San Mateo County at Maple Street Correctional Center, where he has been detained since September 2021. Mr. Roberts has paid sales tax on items in the jail's commissary within the past year.

17. Plaintiff Ruben Gonzalez-Magallanes is currently incarcerated at Maple Street Correctional Center, where he has been detained since August 2022. Mr. Gonzalez-Magallanes has paid sales tax on items in the jail's commissary within the past year.

18. Plaintiff Domingo Aguilar is currently incarcerated in San Mateo County at Maguire Correctional Facility, where he has been detained since June 2022. Mr. Aguilar was previously incarcerated at Maple Street Correctional Center from August 2019 to June 2022. Mr. Aguilar has paid sales tax on items in the jail's commissary within the past year.

19. Plaintiff Kevin Prasad is currently incarcerated at Maple Street Correctional Center, where he has been detained since April 2018. Mr. Prasad has paid sales tax on items in the jail's commissary within the past year.

20. Plaintiff Malti Prasad is the mother of Kevin Prasad. She lives in Sacramento County. She regularly shops in San Mateo County and has paid local sales tax in San Mateo County within the past year.

21. Plaintiff Zachary Greenberg is currently incarcerated at Folsom State Prison, where he has been detained since May 2023. He was previously incarcerated at Maple Street Correctional Center from January 2021 to April 2023, and at Maguire Correctional Facility from December 2020 to January 2021. Mr. Greenberg paid sales tax on items in Maple Street Correctional Center's commissary within the past year.

22. Plaintiff Wumi Oladipo is the significant other of Zachary Greenberg. She lives in Alameda County. She works in San Mateo County and has paid local sales tax in San Mateo County within the past year.

23. Defendant San Mateo County is a local government entity organized under the laws of the State of California. The San Mateo County Sheriff's Office is a division of San Mateo County. At the request of the sheriff's office, San Mateo County contracted with Smart Communications to destroy and digitize incoming non-legal mail through MailGuard.

24. Defendant Christina Corpus is the sheriff of San Mateo County. She is responsible for overseeing the sheriff's office and maintains responsibility for the policies and rules governing the County's correctional facilities, including the mail policy challenged here. She is sued in her official capacity only.

## FACTS

### *Smart Communications and MailGuard*

25. Smart Communications is a Florida-based company founded in 2009 that markets its services to prisons and jails around the country, emphasizing its ability to help law enforcement monitor phone calls, video visits, and electronic and physical correspondence.

26. This case concerns San Mateo County's use of Smart Communications' MailGuard service, which the County uses to eliminate physical mail behind bars. When a prison or jail implements MailGuard, it redirects physical mail to a facility in Florida run by Smart Communications. There, Smart Communications will open, scan, and upload digital copies of the mail into a proprietary database accessible to corrections and law enforcement officers through a searchable dashboard. Smart Communications will then destroy the physical mail. Utilizing the dashboard, corrections officers can review mail and either approve or reject it. If approved, a digital copy of the mail may be accessed by its recipient, typically via tablets or kiosks provided by Smart Communications.

27. Many prisons and jails have historically subjected incoming physical mail to an initial review before delivery to its recipient. The use of MailGuard, however, departs from this practice in two important ways.

28. First, MailGuard involves the elimination of physical mail. Some facilities, including those in San Mateo County, exempt privileged legal mail, but all other physical mail is simply forbidden. As discussed below, the MailGuard service replaces physical mail with scans that must be read on small tablets or kiosks that are in high demand and located in public spaces.

29. Second, the use of MailGuard subjects incoming mail and those who send it to surveillance that is unprecedented in its scope and duration:

a. Smart Communications stores the mail sent through MailGuard for a minimum of seven years, subjecting both the senders and recipients of mail to long-term surveillance. In its contract with San Mateo County, Smart Communications agreed that it would store all digitized mail for seven years "from the date of the inmate's release from the County's Facility." In late 2018, Jon Logan, the founder and CEO of Smart Communications, told a reporter for *Mother Jones* that, in its first ten years of business, Smart Communications had never deleted any records or any data from its database, adding that Smart Communications has "hundreds of millions of data records stored for investigators at anytime."

b. Smart Communications keeps the mail it scans in a searchable database. On information and belief, Smart Communications allows law enforcement officers to run unlimited keyword searches on the entire corpus of digitized mail or to set keyword flags that will notify officers whenever a selected keyword is used in a new piece of incoming mail. Because MailGuard is used on incoming mail, this surveillance implicates not only the incarcerated recipients of mail, but also the family members, friends, religious advisors, and others who send them mail.

c. Finally, on information and belief, this surveillance encompasses not just mail but a great deal of other information as well. MailGuard gives prison and jail officials access to sensitive and previously unavailable information about at least some senders of mail, including their phone numbers, physical addresses, IP addresses, email addresses, credit card and banking information, and GPS locations. Smart Communications collects this information through a service that allows the senders of mail to "track postal mail delivery," but which Smart Communications has advertised to prisons and jails as collecting "significant new intelligence into the public sender of the postal mail, giving postal mail a digital fingerprint."

30. It is no surprise, then, that Smart Communications markets MailGuard as "an invaluable investigative/intelligence gathering tool" that provides a "massive increase in investigative intelligence gained on both inmate and public users." The very purpose of the service is to give law enforcement officers, like those in San Mateo County, the ability to obtain and examine unprecedented intelligence about incarcerated and nonincarcerated correspondents alike.

***San Mateo County's adoption of MailGuard***

31. Prior to April 2021, anyone wishing to communicate with people incarcerated in San Mateo County's jails could send mail directly to the facility. Corrections officers would inspect the mail for the presence of drugs or other threats to facility security, often with the assistance of trained drug-sniffing dogs and TruNarc, a Raman spectroscopy device that scans mail and packages for the presence of narcotics. Once mail was approved, it was delivered directly to its recipient,

who could read (or re-read) the mail at any time and keep it with other personal belongings in their cell.

32. In 2021, with no opportunity for public comment or feedback, San Mateo County abruptly decided to eliminate physical mail within its facilities. On April 6, 2021, the sheriff's office issued a press release stating that, later that month, it would begin destroying and digitizing incoming mail using Smart Communications' services. After that announcement, the sheriff's office informed its corrections officers of the upcoming change and issued a request for proposals relating to mail destruction and digitization services. In May 2021, *after* MailGuard had already been in place for over a month at both Maguire Correctional Facility and Maple Street Correctional Center, San Mateo County announced that it would award the contract to Smart Communications.

33. San Mateo County formally entered into an agreement with Smart Communications on September 1, 2021. Pursuant to that agreement, the County agreed to adopt MailGuard and to make digitized mail accessible only on communal tablets and kiosks provided by Smart Communications, which the company contracted to provide at a ratio of one tablet for every three people incarcerated in San Mateo County's facilities. The agreement does not require Smart Communications to treat the mail it receives confidentially; it does not limit Smart Communications' ability to access or disseminate the information it collects; it does not require Smart Communications to institute specific security practices to minimize the risk of data breaches; it does not prohibit Smart Communications from collecting and monetizing information about the senders and recipients of mail; it does not require Smart Communications to scan mail within a particular time period; and it does not require Smart Communications to scan mail accurately or legibly.

34. Although the agreement purports to exclude religious mail, in practice the County subjects incoming religious correspondence to the mail policy, requiring it to be sent to Florida where it is digitized and then destroyed.

***San Mateo County's use of MailGuard***

**The expressive harms of eliminating physical mail**

35. Physical correspondence is a uniquely important and expressive medium of

communication for incarcerated people and those who wish to communicate with them.

36. Being able to receive physical mail is crucial to individuals behind bars. It offers a kind of intimacy and emotional connection that other forms of communication cannot, by allowing a recipient to hold onto the object of the sender's expression, the very object that they recently held—whether a handwritten letter carefully penned and then folded, or a meticulously drawn picture from a child or young relative, or a photograph with a personal inscription on the back, or a memento chosen to convey what words might fail to express. Physical mail also gives recipients time to read and to reflect in the relative solitude of their jail cells, and to respond when ready with the original letter in front of them. It has a permanence that digital copies lack; many behind bars retain and regularly revisit important letters to remind them of their connections to the outside world and to make it through particularly stressful moments. Tangible correspondence helps to build and sustain the bridges that those behind bars often lean on for resilience, with their loved ones and with their religious advisors and communities.

37. Physical mail is also necessary for incarcerated individuals to meaningfully participate in religious, educational, occupational, or community-based learning. Many in jail turn to outside clergy members for spiritual guidance, to correspondence courses for educational and occupational training, and to community organizations for personal growth and emotional support. These opportunities often involve writings and images best absorbed in physical form, so that recipients can underline, take notes on, contemplate, and easily return to the material. Access to educational material and community correspondence is especially important for those incarcerated in San Mateo County, where in-person educational opportunities are very limited. Educational services and programming were recently suspended for several months at Maple Street Correctional Center, and Maguire Correctional Facility simply does not offer any educational services or programming.

38. For similar reasons, being able to *send* physical mail is important for those who are not incarcerated. And it is especially important to those who are unable to visit their loved ones behind bars, whether because they live far away, are too frail to travel, or are younger than 18 and therefore not permitted to visit their loved ones incarcerated in San Mateo County.

39. San Mateo County has shut down this uniquely important and expressive medium of communication and replaced it with scanned mail, but scanned mail is no substitute. Scanned mail does not carry the same expressive and emotional resonance as physical mail. Social science research confirms this: Physical objects generally evoke stronger emotional responses than their digital counterparts. Objects, especially those linked to loved ones, more easily become infused with emotion, allowing recipients to derive comfort and other meaning from them. One study found that while physical objects evoke feelings of awe, wonderment, and fascination, high-quality digital scans of those objects do not. Even consumer research studies have shown that physical goods, in contrast to digital ones, are associated with greater permanence, emotional connection, and value.

40. The specific manner in which San Mateo County has implemented mail digitization has further undermined the ability of people incarcerated in the County's jails to express themselves and to associate with others through the mail.

a. First, San Mateo County does not allow incarcerated people to access mail except through tablets or kiosks. The County does not print copies of scanned mail for incarcerated people, and it does not provide printers to allow incarcerated people to print their mail directly.

b. Second, the County does not provide those incarcerated with adequate time to read and respond to scanned mail. Tablets can be accessed only during limited recreational time, sometimes for no more than thirty minutes per day, and those incarcerated must also use this limited time for showering, exercising, making phone calls, and other activities. There are typically only ten tablets and four kiosks in a recreational area, although the space may be used by over 50 people at once. Because tablets are also used for other activities, including streaming videos, managing commissary balances, and doing legal research, not everyone who needs to use a tablet during recreational time can access one.

c. Third, private reading and reflection on the tablets is all but impossible. The tablets are available only in shared recreational areas, forcing everyone to read their mail in public spaces.

d. Fourth, the tablets themselves are plagued by technical problems. They frequently freeze, break, or lose their charge.

e. Fifth, the tablets have small screens, making it difficult to read scanned mail. At seven inches across, the screens are only slightly larger than a standard smartphone, and the tablets do not allow users to enlarge or zoom in on text or images.

As a result, people incarcerated in San Mateo County experience significant difficulties in attempting to access and read their scanned mail.

41. Nor are other forms of communication a substitute for the loss of physical mail. Phone calls, for example, are more expensive than mail and are beset by technical difficulties that result in calls being dropped or that leave participants with fewer than fifteen minutes to speak. Phones are in shared spaces, often immediately adjacent to one another, leaving incarcerated people like Mr. Roberts, Mr. Gonzalez-Magallanes, and Mr. Prasad without a private space to speak. Video visitation and email messaging, which can be costly, are conducted through the same tablets and kiosks provided by Smart Communications, and therefore individuals face the same difficulties using them reliably and privately. Video visitation is particularly difficult to use because calls often drop due to poor internet connectivity, and the facial-recognition feature that isolates each user's face can cause the calls to freeze or drop if either user moves their face, tilts their head at an unfamiliar angle, or even sneezes. On information and belief, the facial-recognition feature malfunctions with greater frequency for individuals of color, which was Ms. Oladipo's experience. On information and belief, all of these methods of communication are also recorded and retained for years. Finally, in-person visits are permitted at Maple Street Correctional Center only for people enrolled in jail programming; the availability of programming is limited, and many people have gaps between participating in programs. Most who qualify for in-person visits are permitted only one visit every 15 days. Maguire Correctional Facility allows more frequent visits, but at both facilities San Mateo County has significantly shortened visitation hours since 2019 and does not allow visitation from minors. These alternative channels of communication are logistically challenging, expensive, and afford minimal privacy. And of course, none resembles or replaces the intimacy and reliability that physical mail provides.

42. San Mateo County's elimination of physical mail has been devastating to the ability of those in jail and their loved ones to communicate with one another. As explained further below,

all Plaintiffs have experienced the expressive harms associated with mail digitization.

**The surveillance of mail under the County's mail policy**

43. San Mateo County's mail policy subjects both senders and recipients of mail to long-term and suspicionless surveillance, including for reasons unrelated to the safety of the County's jails.

44. First, through MailGuard, San Mateo County has centralized and long-term access to an extraordinary new breadth of information about incoming mail and those who send it. Through a program provided by Smart Communications, called the SmartEcosystem Dashboard, San Mateo County officials can access digital copies of each piece of incoming non-legal mail received since MailGuard was adopted in 2021. The dashboard also provides access to information collected about the senders of mail, including, on information and belief, information gathered through its mail tracking service. Below is a screenshot used in Smart Communications' past marketing showing the dashboard's section on the public senders of mail. On information and belief, the version of the dashboard used by San Mateo County today is similar.[2]

[2] Smart Communications did not redact inmate names and IDs from this screenshot, which was featured in a marketing proposal it submitted to the Virginia Department of Corrections in 2018. An unredacted copy of the proposal was disclosed and then made public in response to a Virginia Freedom of Information Act request. To preserve the privacy of the correspondents, Plaintiffs here have included the redacted version of the screenshot used in an article describing the proposal. *See* Aaron Gordon, *Prison Mail Surveillance Keeps Tabs on Those on the Outside, Too*, Vice (Mar. 24, 2021), https://www.vice.com/en/article/wx8ven/prison-mail-surveillance-company-keeps-tabs-on-those-on-the-outside-too.

> Public Users - System Level -

Editing User:

Info Notes Security GPS Location Messages Photos Orders Credits **Connections** Invitation Blocks Notifications

Current Connections

| Inmate Name | Inmate ID | Status | Location | Date Connected | Connection Type | Actions |
|---|---|---|---|---|---|---|
| | | Inactive | Polk County Jail | 12/12/2017 | Standard User | Delete Block |
| | | Current | Polk County Jail | 05/03/2018 | Standard User | Delete Block |
| | | Current | Polk County Jail | 06/03/2018 | Standard User | Delete Block |
| | | Current | Polk County Jail | 07/17/2018 | Standard User | Delete Block |
| | | Current | Polk County Jail | 12/04/2017 | Standard User | Delete Block |

Recent Locations: - Select -

GPS coordinates on 07/17/2018 @ 6:39 PM: 28.1649811 by -81.9289064 (external map)

Map Satellite

Central Florida Wash Systems
Love That Bulldog
Binocular Service & Repair Center
Doll-McGinnis Publications
Moore Rd
Pinetop Dr W
Pinetop Dr E
Hollywood Ln
Beverly Hills Rd
Pine Tree Dr
Pinecrest Dr
Pine Grove Dr
Pineford Rd
Pine Glen Rd
onghorn Dr

45. Second, San Mateo County permits law enforcement officers from across the jurisdiction—including investigators in the sheriff's office, the district attorney's office, and in other municipalities—to search this information at any time, for any reason or no reason at all. San Mateo County does not, for example, require law enforcement officers to seek any sort of internal approval or articulate any individualized suspicion of wrongdoing before conducting searches in the SmartEcosystem Dashboard. The County's Corrections Manual instructs corrections officers in particular to "read [correspondence] as frequently as deemed necessary to maintain security or monitor a particular problem." On information and belief, County officials have used their authority to search through the dashboard freely.

46. Third, San Mateo County's adoption of MailGuard also exposes this private information to Smart Communications, which, on information and belief, is free to use the information however it pleases. San Mateo County's contract with Smart Communications places no limit on how the company can utilize the information it gathers from physical mail or by tracking the public senders of it. For example, on information and belief, Smart Communications has

previously advertised MailGuard by using screenshots of an individual's actual mail, without regard for their privacy. In 2018, Smart Communications included the following screenshot of what appears to be a private letter—without the redaction seen here—in a proposal it made to the Virginia Department of Corrections.[3]




47. San Mateo County and Smart Communications have not provided either the senders or recipients of mail with notice describing how they now store and search mail. Many family members and senders of mail only learned about the adoption of MailGuard from their loved ones, and otherwise had no way to know that sending a letter to someone incarcerated in San Mateo County would result in extensive, long-lasting surveillance. When mail is sent directly to a San Mateo County jail, the County either forwards the mail to Smart Communications or returns the mail with instructions to send it to Florida, but it does not inform the sender that doing so will subject them to long-term surveillance by law enforcement officers and a private contractor. The

[3] As described in note 2, *supra*, the version provided to the Virginia Department of Corrections redacted neither the name of the sender nor of the recipient.

mailing instructions page on the County sheriff's office website instructs people to send mail to Smart Communications' Florida mailing address, but it does not provide any information about its destruction of mail and surveillance of the digital copies. A notice buried elsewhere on its website, and, on information and belief, posted in the lobbies and some common areas of the jails, describes a "new jail mail procedure" but fails to explain that the digital copies of mail are accessible to both San Mateo County and Smart Communications for at least seven years after the recipient has been released from County custody. On information and belief, the notice provided to incarcerated recipients through Smart Communications tablets similarly omits this crucial information.

48. This unprecedented invasion of privacy in San Mateo County's jails has predictably chilled the use of mail, as similar mail digitization efforts have in other locations. For example, when Tuolumne County, California implemented MailGuard, it recorded a decrease in mail sent to people incarcerated in its jails—a fact Smart Communications used to advertise MailGuard to San Mateo County. And in response to Pennsylvania's adoption of MailGuard in 2018, multiple family members explained to reporters that they subsequently stopped or altered their use of mail to communicate with their loved ones in custody. As discussed further below, all Plaintiffs have experienced this chilling effect and reduced or stopped their use of mail to communicate in the wake of San Mateo County's adoption of MailGuard.

**The lack of penological justification for the County's mail policy**

49. San Mateo County has never adequately explained its decision to adopt this mail policy, nor is there a legitimate government interest in retaining it. In the County's initial press release announcing the adoption of MailGuard, the County said only that it would "mak[e] some changes to the way people receive mail" to "prioritize the safety and security of those in our correctional facilities." And in response to criticism of the decision on Facebook, the sheriff's office asserted that "our changes are to help keep everyone safe since there has been some concerns regarding fentanyl exposures with the old mail system we were using." But the County has said virtually nothing else to explain the decision.

50. San Mateo County has never publicly suggested that fentanyl was a significant problem within its facilities, that the presence of fentanyl was significantly increasing, or that any

data pointed to mail as a significant source of fentanyl. Indeed, although the sheriff's office has not provided information on fentanyl-related drug incidents, an outside study of fentanyl overdoses around the United States revealed that, between 2013 and March 30, 2021, there were no publicly reported fentanyl-related overdoses in either of the County's jails.

51. Nor is there evidence that mail is a significant source of fentanyl or other drugs in San Mateo County's jails. Court records, federal investigations, and public statements instead show that the primary channel through which drugs are introduced into jails and prisons is *staff*. For example, the executive director of the Missouri Corrections Officers Association admitted in 2022 that staff were the main source of drugs in Missouri's jails. Also in 2022, a New York City Department of Corrections investigator testified in federal court that drugs and other contraband can "usually" be traced to jail staff and officers. Finally, in a 2019 report on conditions in the Alabama prison system, the U.S. Department of Justice described interviews with multiple officials who confirmed that staff smuggling was the primary source of drugs, and it recommended screening all staff for drugs in the future. In San Mateo County itself, staff smuggling also appears to be a problem; multiple jail employees have pleaded no contest to charges that they smuggled drugs into its jails.

52. In contrast, mail-related drug trafficking appears rare. In Florida state prisons, for example, less than 2% of the contraband items confiscated over a two-year period were traced back to mail, and only 0.35% of mail contained contraband. In Texas, the rate of mail with suspicious or "uninspectable" substances—which would include drugs as well as stickers or fragrances—was only 0.5% in 2019.

53. There is also little evidence that mail digitization reduces the prevalence of drug use or drug overdoses in jails or prisons. Following statewide adoption of MailGuard in Pennsylvania, the drug test positivity rate actually increased. Similarly, after Missouri contracted with a different company to digitize and destroy incoming mail, the number of average overdoses in the state's jails and prisons increased from thirty-one to thirty-seven per month. And in New Mexico, after prisons banned physical mail, the drug test positivity rate nearly doubled.

54. Any claims that San Mateo County may make to justify the elimination of physical mail because of health effects on staff who handle drug-laced mail would be similarly unsupported. There is no evidence that drug-laced mail poses a serious threat to prison staff who inspect it. As the *New York Times* and others have reported, scientific literature has shown definitively that brief contact with fentanyl—even without gloves or other common protective clothing—is insufficient to cause a high, let alone an overdose. And in any event, the digitization of mail does not actually eliminate the need to handle the mail; it simply shifts the responsibility for doing so to others working at the behest of the County.

55. Nor has the County attempted to explain why other, less speech-restrictive and more privacy-protective tools that could limit drug use in its facilities are insufficient. For example, the County has previously used drug-sniffing dogs and Raman spectroscopy devices to scan mail for the presence of drugs. And there are means of limiting drug use that extend beyond mail: Examples from other correctional facilities indicate the adoption of better drug treatment programs and staff security measures can reduce drug overdoses and drug test positivity rates.

56. Rather than serve San Mateo County's penological interests, the County's mail policy harms them. Correspondence plays a crucial role in strengthening community and family connections, improving post-release outcomes, and promoting better mental health. Regular communication—including through mail—strengthens an incarcerated person's community ties, which predict better adjustment following incarceration. In the words of criminologist Joan Petersilia, "*every* known study that has been able to directly examine the relationship between a prisoner's legitimate community ties and recidivism has found that feelings of being welcome at home and the strength of interpersonal ties outside prison help predict postprison adjustment." For instance, studies have found that more frequent family contact, including through letters, is associated with greater feelings of connectedness; stronger parent-child relationships; improved mental health for incarcerated people; reduced depression and anxiety for children of incarcerated parents; and a higher likelihood of housing stability, income self-sufficiency, and educational or vocational advancement. Recognizing the importance of this communication, both the California

Department of Corrections and Rehabilitation and the federal Bureau of Prisons explicitly encourage correspondence during incarceration.

57. Physical letters are particularly important during incarceration. Studies confirm that letter-writing creates space for communication in which both senders and recipients have time for reflection. Some studies of incarcerated parents suggest that parents opt for writing letters over other forms of contact for this reason. And as discussed above, other studies have emphasized that physical objects are associated with permanence and emotional attachment. The County's mail policy deprives people of these benefits of letter-writing. The limited, public access incarcerated people have to their scanned mail does not provide the contemplative space or privacy necessary to foster their relationships, and the scanned mail itself does not carry the same emotional resonance as the original physical copy. As a result, the County's policy impedes incarcerated people and nonincarcerated letter-writers from maintaining these vital ties.

***The Plaintiffs***

58. Plaintiffs in this case are people and organizations who have been injured by San Mateo County's mail policy. They have been deprived of the opportunity to communicate with their loved ones and communities through physical mail, either because they are or have been incarcerated in one of the County's jails or because they have had a relationship with someone who is. They have been deterred by the knowledge that San Mateo County and Smart Communications are collecting and storing digitized copies of their correspondence, and many Plaintiffs have responded by refusing to send mail into the County's jails or by asking their loved ones not to do so. They have struggled to maintain personal, religious, and community-based connections, because there are no other forms of communication that substitute for physical mail. As described further below, their privacy, their relationships, and their expression have all been compromised by the County's use of MailGuard.

**A.B.O. Comix**

59. Plaintiff A.B.O. Comix is a collective of artists that works to amplify the voices of incarcerated LGBTQ people through artistic expression. It collaborates closely with incarcerated artists to promote mutual support and to keep incarcerated members connected to the outside

community. It has nearly 450 incarcerated members, including at least one member incarcerated in Maple Street Correctional Center with whom A.B.O. Comix's staff has corresponded in the last year.

60. Correspondence with incarcerated people is at the core of A.B.O. Comix's mission. The collective relies on mail to communicate with incarcerated people about their artistic projects, to circulate newsletters with interactive storytelling prompts, to connect people in prisons and jails with penpals, and to send holiday cards as signs of love and support.

61. Mail digitization and destruction policies, including San Mateo County's, have undermined A.B.O. Comix's expression and association with its incarcerated members. Many of the materials the collective wishes to send to its incarcerated members simply cannot be replicated via scanned mail. For example, its quarterly newsletter includes storytelling prompts meant to help incarcerated members think creatively and grow as artists and writers. The prohibition on physical mail makes it impossible for newsletter recipients to fill out or annotate these prompts directly, and because San Mateo County allows only limited access to tablets, creating art using the storytelling prompts is impractical for people in the County's jails. Many of the collective's nonincarcerated members also create intricate, hand-crafted messages and hand-drawn pictures for their incarcerated penpals, and they do not believe that scanned copies can ever substitute for these messages. The destruction of their original letters is demoralizing for A.B.O Comix's staff and nonincarcerated members.

62. Mail digitization and destruction policies, including San Mateo County's, have also deterred members of the collective from expressing themselves as openly. A.B.O. Comix's staff and nonincarcerated members now hesitate to write as freely, especially about political or LGBTQ issues. While A.B.O. Comix is a collective aimed at supporting incarcerated members of the LGBTQ community, not all of its members may identify as queer within jailhouse walls. Knowing their letters will be read in public spaces and retained for years by jail officials and private companies, nonincarcerated members now write less freely about LGBTQ issues out of fear for retaliation against incarcerated penpals.

**Kenneth Roberts**

63. Plaintiff Kenneth Roberts has been incarcerated at Maple Street Correctional Center since September 2021. Mr. Roberts is one of 24 people currently enrolled in the jail's substance abuse intervention program, previously named the CHOICES Program, which is an application-only program with a waiting list of approximately 200 people. Mr. Roberts is also a devoted father and the son of loving parents. He spends a significant amount of his time counseling and supporting others incarcerated in the jail, and has even become a de facto barber for some of the men incarcerated with him.

64. Although Mr. Roberts feels compelled to use MailGuard to keep in touch with his family, the invasiveness of the County's mail policy has inhibited his expression and association with others. He is acutely aware that his mail can be read at any time, for any purpose, over many years by San Mateo County or by Smart Communications. He also knows that other people in his pod can see his mail when he views it on a tablet in the recreational room. He receives far less mail now than he did during previous periods of incarceration at facilities that did not rely on MailGuard, in part because his family members want to avoid the long-term retention of their intimate communications. Mr. Roberts does not recall receiving any non-legal mail in the last year.

65. San Mateo County's prohibition on physical mail substantially restricts Mr. Roberts's ability to communicate. In his view, scanning mail destroys its sentiment. He is especially distressed that he can no longer hold the drawings his four-year-old daughter still occasionally creates for him, that he cannot trace her designs and feel the texture of her colored pencil on the paper, and that her original artwork is being destroyed by Smart Communications. Equally upset by the destruction of her artwork, his daughter's mother has stopped encouraging her to make and send him pictures. Mr. Roberts also finds it difficult to read and respond thoughtfully to scanned letters, because of his limited access to tablets and his inability to underline and revisit portions of letters he wants to respond to.

66. Mr. Roberts would also like to use mail to further his education, but the County's mail ban has prevented him from doing so. He has looked into opportunities to earn college credit and to continue working towards his certification as a substance use counselor through

correspondence courses, but he has concluded that it would be impossible to take advantage of these opportunities without being able to fill out physical coursework and without having sufficient tablet access to ensure that he could complete readings and take notes.

**Ruben Gonzalez-Magallanes**

67. Plaintiff Ruben Gonzalez-Magallanes has been incarcerated at Maple Street Correctional Center since August 2022. He has been a devout adherent of Maliki Sunni Islam for eight years.

68. Although Mr. Gonzalez-Magallanes felt compelled to consent to MailGuard's terms of use so that he could receive his mail, the invasiveness of MailGuard has inhibited his expression and association with others. Though he was previously incarcerated in a facility that photocopied physical mail, he has never before had his mail subjected to long-term retention and surveillance. Knowing that letters addressed to him are accessible to both the County and a private company, he now communicates much less frequently with his mother and his imam.

69. The County's prohibition on physical mail substantially restricts Mr. Gonzalez-Magallanes's ability to communicate. He especially cherished the ability to smell the scent of his mother's perfume on the physical letters she used to send him. He does not believe scanned mail is a substitute for the original letters and cards he once received.

70. The County's mail policy has also impeded Mr. Gonzalez-Magallanes's religious expression and practice. He once relied on written materials, like letters or pamphlets, to study the teachings of Islam and maintain his religious practice. During prior periods of incarceration, he could meet with imams in person and attend group worship. Because these options are not available in San Mateo County, physical texts and teachings are even more central to his ability to practice Islam. He also relied on written materials to share his beliefs with other people in Maple Street Correctional Center. His faith teaches that he may not withhold knowledge from those who seek to learn, but that it is a sin to misconstrue the teachings of Islam. He believes that putting his imam's teachings into his own words would violate this precept. The County's ban on physical mail has meant that Mr. Gonzalez-Magallanes can no longer fulfill his mandate to study and share knowledge of Islam.

**Domingo Aguilar**

71. Plaintiff Domingo Aguilar is in civil detention at Maguire Correctional Facility, where he has been since approximately June 2022. Before that, he was incarcerated at Maple Street Correctional Center from August 2019 to June 2022. Mr. Aguilar is a loving son whose elderly mother lives in Arizona near the U.S.-Mexico border.

72. The invasiveness of MailGuard has inhibited Mr. Aguilar's expression and association with others. As soon as San Mateo County adopted the mail policy, he became concerned about his privacy and the privacy of his loved ones. He refused to consent to receive mail through MailGuard and immediately advised his family to stop sending him mail.

73. The loss of physical mail has affected Mr. Aguilar deeply. Prior to the new policy, he relied on mail to stay in touch with his mother, who is elderly and lives far from San Mateo. He still keeps several pieces of mail he received before the adoption of MailGuard, including a letter from his father and birthday cards, and re-reads them again and again, often doing so at night to comfort himself and reduce stress. The loss of physical mail deprives Mr. Aguilar of this singular comfort, and he is especially distraught that his mother cannot mail him physical photos of his granddaughter, who was born in June 2022. Mr. Aguilar does not believe that other methods of communication can ever substitute for the connection and expression he achieved through physical correspondence.

**Kevin Prasad**

74. Plaintiff Kevin Prasad has been incarcerated at Maple Street Correctional Center since April 2018. Mr. Prasad spends his time practicing the Hindu religion; connecting with his mother, sister, father, and uncle; and helping other incarcerated individuals advocate for themselves and conduct legal research.

75. The invasiveness of MailGuard has inhibited Mr. Prasad's expression and association with others. Knowing that he must now access mail in public spaces and that mail will be subject to long-term surveillance by San Mateo County and Smart Communications, he has instructed his family members to stop sending him mail. He has received only two pieces of mail through MailGuard. Those items were already available in Mr. Prasad's MailGuard account when

he first signed on and accepted its terms of use—indicating that the mail had been scanned and uploaded before Smart Communications had his consent to do so. Mr. Prasad subsequently wrote to Smart Communications and stated that he withdrew his consent to the MailGuard terms of use, but he did not receive a response.

76. Mr. Prasad believes that San Mateo County's prohibition on physical mail substantially restricts his ability to communicate. He misses receiving multiple letters per month from his family members. He views physical mail as uniquely expressive and deeply values the physical letters he has from before the mail ban. He is especially disturbed that, under the policy, he is no longer able to touch the letters his family members touched and smell the familiar scents that lingered on mail sent by his mother and uncle. The loss of mail is particularly challenging because he lacks meaningful alternatives; for example, his older relatives struggle with video visitation, and his parents live over two hours away from the jail, making in-person visitation difficult.

77. The mail policy has also impeded Mr. Prasad's religious practice. Mr. Prasad comes from a religious family that practices a form of Hinduism unique to his ancestral home in Fiji. Mr. Prasad relies on written prayers, religious texts, and images of deities to practice his religion. In accordance with his religious practices, he uses religious imagery to focus his attention during meditation and prayer. Since the County banned physical mail, however, he cannot receive these materials from his family members through the mail. Mr. Prasad's belongings, including religious materials he received before the adoption of MailGuard, were lost while he was temporarily hospitalized in November 2022, depriving him of those materials. Mr. Prasad tried requesting images of Hindu deities from the Service League of San Mateo County, a non-profit agency that provides services for those incarcerated in the County's jails, but Service League is not permitted to provide printed materials that include images. These materials are central to his religious practice, and the loss of mail as a reliable source of religious instruction has hampered Mr. Prasad's ability to worship in the tradition in which he was raised.

**Malti Prasad**

78. Plaintiff Malti Prasad is the mother of Kevin Prasad. She works full-time at the

California Department of Motor Vehicles. She is also a religious woman, who regularly prays and celebrates Hindu holidays.

79. The invasiveness of MailGuard has inhibited Ms. Prasad's expression and association with others. Prior to the adoption of MailGuard, Ms. Prasad's letters to her son were reviewed briefly by corrections officers when they arrived at the jail, but the surveillance enabled by MailGuard involves long-term storage and searchability of her letters. Ms. Prasad's letters to her son were often quite personal, and she feels that allowing her mail to be scanned and stored by Smart Communications and San Mateo County would be akin to allowing someone to make a copy of and read her diary. Despite the personal cost, she decided to stop communicating with her son by mail.

80. Exchanging letters with her son was a vital form of communication for Ms. Prasad, which she has now lost. She commonly sent him written prayers, discussed her thoughts and feelings, and used the letters to teach him her native language, Fiji Hindi. These letters helped her to maintain a deep expressive and emotional connection with her son. The inability to send her son letters has deeply distressed Ms. Prasad. Although Ms. Prasad drives four hours every Sunday to see her son, sometimes only through a video monitor, and occasionally speaks to him by phone, these methods of communication are no substitute for the ease and intimacy of correspondence. The County's mail policy has substantially damaged her ability to express herself and to connect with her son.

**Zachary Greenberg**

81. Plaintiff Zachary Greenberg was incarcerated at Maple Street Correctional Center from January 2021 to April 2023. Mr. Greenberg is a devoted partner to his significant other Wumi Oladipo and remains close to his parents and other family members. He also practices Judaism and has found connecting to his religion especially important to enduring the challenges and isolation of incarceration. Although Mr. Greenberg is no longer in San Mateo County's custody, on information and belief, digital copies of all of the mail sent to him between April 2021 and April 2023 remain accessible to County law enforcement at any time.

82. When he was incarcerated in San Mateo County, the invasiveness of MailGuard inhibited Mr. Greenberg's expression and association with others. He initially received mail through MailGuard, but the surveillance made possible by Smart Communications led Mr. Greenberg to limit his communication by mail. Eventually, he told his family and friends not to send mail to him at all. He also filed formal grievances protesting the mail policy as unconstitutional and stating that he withdrew his consent to MailGuard's terms of use. However, the policy of the sheriff's office is not to accept grievances "if they are challenging the rules and policies themselves," and he did not receive any acknowledgment of or response to these grievances. Mr. Greenberg also attempted to withdraw his consent on the tablets provided by Smart Communications but could not find any option to do so. Mr. Greenberg later confirmed that his express withdrawal of consent was not honored: mail sent to him by post-release programs was still scanned and uploaded to MailGuard. Because receiving this mail was critical to Mr. Greenberg's work preparing for probation hearings and securing reentry assistance, he felt that he had no choice but to continue checking his MailGuard account throughout his time in jail.

83. San Mateo County's prohibition on physical mail substantially restricted Mr. Greenberg's ability to communicate. Before the current mail policy was enacted, he received letters from Ms. Oladipo regularly. He cherishes those letters and has saved them to re-read; he finds them especially helpful at times when he is struggling emotionally. But from April 2021 to April 2023, Mr. Greenberg was not able to receive physical mail from any loved ones, and after he told them to stop using MailGuard, he no longer received even scanned mail from them. The loss of this crucial medium of communication caused him significant distress, especially because no other form of communication available to him could provide the intimacy, privacy, and reliability of physical mail.

84. San Mateo County's mail policy also interfered with Mr. Greenberg's ability to correspond with and secure acceptance to post-release reentry programs. Many of these programs communicate only by mail, and the correspondence is often time-sensitive. Mr. Greenberg found it nearly impossible to correspond with reentry programs in a timely manner through MailGuard, sometimes not receiving their mail until more than a month after it was sent.

85. The elimination of physical mail impeded Mr. Greenberg's practice of his religion as well. While incarcerated in San Mateo County, Mr. Greenberg wanted to correspond with a rabbi because he was told that no rabbis were available for in-person religious meetings at the jail. Mr. Greenberg considered mail as an alternative way of connecting with and receiving guidance from clergy leaders of his faith, but because he objected to the scanning, surveillance, and retention of his personal religious correspondence, that option was not available to him.

**Wumi Oladipo**

86. Plaintiff Wumi Oladipo, who resides in Alameda County, is the significant other of Zachary Greenberg. Ms. Oladipo works as a clinical researcher at a biotechnology company and is studying to go to medical school. Ms. Oladipo's ability to express herself and communicate with Mr. Greenberg were substantially restricted between April 2021, when the County adopted its mail policy, and April 2023, when Mr. Greenberg was transferred to state custody. On information and belief, digital copies of the mail Ms. Oladipo sent Mr. Greenberg during that time remain accessible to the County.

87. During Mr. Greenberg's incarceration in San Mateo County, the invasiveness of MailGuard inhibited Ms. Oladipo's expression and association with him. She initially continued to send mail to Mr. Greenberg after the County implemented MailGuard, but she was unaware of the mail policy until Mr. Greenberg called her because he was upset about its adoption. Ms. Oladipo became uncomfortable using MailGuard because of concerns about the County's surveillance of her letters and photographs, as well as the lack of clear limits on their use and storage by Smart Communications. In February 2022, she made the difficult decision to stop sending physical mail to Mr. Greenberg altogether.

88. The inability to send Mr. Greenberg physical letters during that time profoundly affected Ms. Oladipo's ability to communicate. Letters were integral to Ms. Oladipo's ability to sustain a romantic relationship with Mr. Greenberg. Both have kept a collection of the physical correspondence that they sent to each other. Before the mail ban, they played games like crosswords and tic tac toe via mail, and Ms. Oladipo sometimes sprayed her perfume on or kissed the letters she sent to Mr. Greenberg. Once Ms. Oladipo could no longer rely on mail for these purposes, she

found it much more challenging to support and meaningfully communicate with Mr. Greenberg. As a dark-skinned Black woman, Ms. Oladipo had particular difficulty with Smart Communications' video visitation software. The software's facial recognition technology often did not recognize Ms. Oladipo's face, which made it frustrating—and often impossible—to conduct video calls. And although she and Mr. Greenberg spoke on the phone, these brief conversations were more logistical in nature and did not create the same feeling of intimacy that their letters once did. Without mail, Ms. Oladipo struggled to maintain her connection to Mr. Greenberg. Now that Mr. Greenberg is being held in a facility that allows physical mail and does not use MailGuard, he and Ms. Oladipo are exchanging letters weekly and have been happy to resume the written correspondence that they held so dear.

## CAUSES OF ACTION

### COUNT ONE

***Article I, Section 2 of the California Constitution***

***On behalf of all Plaintiffs against all Defendants***

89. Defendants' mail policy—which includes opening, examining, destroying, and digitizing physical mail and retaining mail and sender information for subsequent investigative use—violates Article I, Section 2 of the California Constitution because it eliminates an entire medium of communication, because it chills the expressive and associational activity of Plaintiffs and others, because it is not rationally related to any legitimate penological goals, and because it leaves no adequate alternatives to communication via physical mail.

### COUNT TWO

***Article I, Section 13 of the California Constitution***

***On behalf of all Plaintiffs against all Defendants***

90. Defendants' mail policy violates Article I, Section 13 of the California Constitution because it constitutes an unreasonable search and seizure of correspondence and other information in which Plaintiffs and others maintain a reasonable expectation of privacy and a possessory interest, and because the policy is not rationally related to any legitimate penological goals.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

A. Declare that Defendants' mail policy—which includes opening, examining, destroying, and digitizing physical mail and retaining mail and sender information for subsequent investigative use—violates Article I, Section 2 and Article I, Section 13 of the California Constitution.

B. Enjoin Defendants and their agents from digitizing and subsequently destroying incoming physical mail.

C. Enjoin Defendants and their agents from denying incarcerated people access to physical copies of their mail.

D. Enjoin Defendants and their agents from retaining digital copies of incoming physical mail without reasonable suspicion of wrongdoing.

E. Order Defendants to provide to those incarcerated in San Mateo County's jails a physical copy of all mail addressed to them that was digitized through MailGuard, and to subsequently expunge all copies of such mail collected through MailGuard.

F. Enjoin Defendants from continuing to read, search, or otherwise use the scanned mail and other information collected through MailGuard.

G. Award Plaintiffs their reasonable costs and attorneys' fees incurred in this action.

H. Grant such other and further relief as the Court may deem just and proper.

Dated: May 24, 2023

Respectfully Submitted,

*/s/ Stephanie Krent*
STEPHANIE KRENT (*Pro Hac Vice* motion forthcoming)
ALEX ABDO (*Pro Hac Vice* motion forthcoming)
KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY
475 Riverside Drive, Suite 302
New York, NY 10115
Tel.: (646) 745-8500

*/s/ Cara Gagliano*
CARA GAGLIANO (SBN 308639)
AARON MACKEY (SBN 286647)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel.: (415) 436-9333
Fax: (415) 436-9993
Email: cara@eff.org
amackey@eff.org

Fax: (646) 661-3361
Email: stephanie.krent@knightcolumbia.org
alex.abdo@knightcolumbia.org

*/s/ Maria Del Pilar Gonzalez Morales*
MARIA DEL PILAR GONZALEZ MORALES (SBN 308550)
SHUBHRA SHIVPURI (SBN 295543)
SOCIAL JUSTICE LEGAL FOUNDATION
523 West 6th Street, Suite 450
Los Angeles, CA 90014
Tel.: (213) 973-4063
Fax: (213) 973-4063
Email: pgonzalez@socialjusticelaw.org
sshivpuri@socialjusticelaw.org

*Attorneys for Plaintiffs A.B.O. Comix, Kenneth Roberts, Zachary Greenberg, Ruben Gonzalez-Magallanes, Domingo Aguilar, Kevin Prasad, Malti Prasad, and Wumi Oladipo*