1   PATRICK M. RYAN (SBN 203215)
      *pryan@bzbm.com*
2   CHAD E. DEVEAUX (SBN 215482)
      *cdeveaux@bzbm.com*
3   CHRISTOPHER W. GRIBBLE (SBN 285337)
      *cgribble@bzbm.com*
4   TAYLOR YAMAHATA (SBN 347192)
      *tyamahata@bzbm.com*
5   BARTKO ZANKEL BUNZEL & MILLER
    A Professional Law Corporation
6   One Embarcadero Center, Suite 800
    San Francisco, California 94111
7   Telephone: (415) 956-1900
    Facsimile:  (415) 956-1152
8
    Attorneys for Defendants COUNTY OF SAN
9   MATEO and CHRISTINA CORPUS

10

11                    UNITED STATES DISTRICT COURT

12        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

13

| 14 | A.B.O. Comix, Kenneth Roberts, Zachary Greenberg, Ruben Gonzalez-Magallanes, Domingo Aguilar, Kevin Prasad, Malti Prasad, and Wumi Oladipo, | Case No. 3:23–cv–01865–JSC |
|---|---|---|

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO DISMISS PLAINTIFF A.B.O. COMIX'S, PLAINTIFF ZACHARY GREENBERG'S, AND PLAINTIFF WUMI OLADIPO'S CLAIMS FOR LACK OF STANDING**

14   A.B.O. Comix, Kenneth Roberts, Zachary
15   Greenberg, Ruben Gonzalez-Magallanes,
     Domingo Aguilar, Kevin Prasad, Malti Prasad,
16   and Wumi Oladipo,

                   Plaintiffs,
17
              v.
18
     County of San Mateo and Christina Corpus, in
19   her official capacity as Sheriff of San Mateo
     County,
20
                   Defendants.
21

Date:        September 7, 2023
Time:        10:00 A.M.
Courtroom:   8
Judge:       Hon. Jacqueline Scott Corley

Trial Date:    TBD

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ALLEGED BY PLAINTIFFS ..................................4

III. ANALYSIS ........................................................................................................5

    A.   Plaintiffs' Claims Should Be Dismissed Because They Are Not Justiciable............5

        1.   Lead Plaintiff-A.B.O. Lacks Associational Standing ......................5

        2.   Plaintiffs Zachary Greenberg and Wumi Oladipo Lack Standing .................7

        3.   Plaintiffs Failed to Exhaust Their Administrative Remedies........................8

    B.   Plaintiffs' Claims Fail on the Merits as a Matter of Law...........................................9

        1.   Plaintiffs' Search-and-Seizure Claim Is Patently Frivolous .........................9

        2.   Plaintiffs' Free-Speech Claim Fails as a Matter of Law .............................12

            a.   The *Turner* Test.............................................................................13

            b.   *Honea* and *HRDC* Prove the County's Mail Policy Is Reasonably Related to a Legitimate Penological Interest as a Matter of Law...................................................................................15

            c.   The Policy Satisfies All the *Turner* Factors as a Matter of Law.................................................................................................16

                (i)   The Mail Policy Furthers Neutral and Legitimate State Objectives and Is Rationally Related to Those Objectives............................................................................16

                (ii)   The Policy Provides Alternative Means for Prisoners to Exercise Their Right to Use the Mail..............................17

                (iii)   An Accommodation Would Endanger Inmates and Staff...............................................................................18

                (iv)   The Policy Is Not an Exaggerated Response ......................20

IV.  CONCLUSION ................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*21st Cent. Ins. Co. v. Superior Court*
   127 Cal. App. 4th 1351 (2005) ........................................................................ 13

*Antonetti v. McDaniels*
   2021 WL 624241 (D. Nev. Jan. 25, 2021) ...................................................... 19

*Assoc. Gen. Contractors v. Cal. Dep't of Transp.*
   713 F.3d 1187 (9th Cir. 2013) .......................................................................... 7

*Assoc. Gen. Contractors v. Metro Water Dist.*
   159 F.3d 1178 (9th Cir. 1998) .......................................................................... 6

*Beard v. Banks*
   548 U.S. 521 (2006) ........................................................................................ 17

*Bell v. Wolfish*
   441 U.S. 520 (1979) ........................................................................................ 19

*Blake v. PUC of City & Cnty. of San Francisco*
   120 Cal. App. 2d 671 (1953) ............................................................................ 8

*Burgess v. HP, Inc.*
   No. 16–CV–04784–LHK, 2017 WL 467845 (N.D. Cal. Feb. 3, 2017) ................... 1

*Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*
   No. 2:22–cv–07346–SB–JC, 2022 WL 18142541 (C.D. Cal., Dec. 5, 2022) ......... 6

*Chau v. Young*
   No. C 13–764 SI (pr), 2014 WL 4100635 (N.D. Cal. Aug. 20, 2014) ................. 19

*City & Cnty. of San Francisco, v. Purdue Pharma L.P.*
   491 F. Supp. 3d 610 (N.D. Cal. 2020) ...................................................... 20, 21

*City & Cnty. of San Francisco v. Purdue Pharma, L.P.*
   620 F. Supp. 3d 936, 22 U.S. ......................................................................... 19

*Cnty. of Nev. v. Superior Court (Siegfried)*
   236 Cal. App. 4th 1001 (2015) ................................................................... 3, 12

*In re Collins*
   86 Cal. App. 4th 1176 (2001) .................................................................. *passim*

*Commonwealth v. Burton*
   234 A.3d 824 (Pa. Sup. Ct. 2020) .................................................................. 21

*Crime Justice & Am. v. Honea*
   876 F.3d 966 (9th Cir. 2017) ................................................................................ *passim*

*Crump v. Gomez*
   No. C 94–4133 MHP, 1995 WL 274359 (N.D. Cal. April 27, 1995) .................................... 12

*E. Bay Sanctuary Covenant v. Biden*
   993 F.3d 640 (9th Cir. 2021) ........................................................................................ 5

*In re Espinoza*
   192 Cal. App. 4th 97 (2011) ........................................................................................ 17

*Evans v. Skolnik*
   997 F.3d 1060 (9th Cir. 2021) ..................................................................................... 13

*Faunce v. Cate*
   222 Cal. App. 4th 166 (2013) ...................................................................................... 10

*Fields v. Paramo*
   No. 2:16–cv–1085 JAM, 2019 WL 4640502 (E.D. Cal. Sept. 24, 2019) .............................. 21

*Friend v. Kolodzieczak*
   923 F.2d 126 (9th Cir. 1991) ....................................................................................... 17

*In re Furnace*
   185 Cal. App. 4th 649 (2010) ...................................................................................... 14

*FW/PBS, Inc. v. City of Dallas*
   493 U.S. 215 (1990) ..................................................................................................... 6

*Gerawan Farming Inc. v. Lyons*
   24 Cal. 4th 468 (2000) ............................................................................................... 12

*Hollingsworth v. Perry*
   570 U.S. 693 (2013) ..................................................................................................... 5

*Hudson v. Palmer*
   468 U.S. 517 (1984) ............................................................................................. 10, 12

*Human Rights Def. Center v. Bd of Cnty. Comm'rs*
   __ F. Supp. 3d __, 2023 WL 1473863 (D.N.H. Feb. 2, 2023) ...................................... *passim*

*Hunt v. Wash. State Apple Advert. Com'n*
   432 U.S. 333 (1977) ..................................................................................................... 7

*In re Jenkins*
   50 Cal. 4th 1167 (2010) .............................................................................................. 14

*King v. Baca*
   No. CV 00–11178 FMC CWX, 2001 WL 682793 (C.D. Cal. June 12, 2001) ...................... 4, 8

*Kuperman v. Wrenn*
    645 F.3d 69 (1st Cir. 2011) .................................................................................. 20

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*
    624 F.3d 1083 (9th Cir. 2010) ................................................................................ 6

*Lanza v. State of N.Y.*
    370 U.S. 139 (1962) ............................................................................................. 11

*Loehr v. Nev.*
    CV–N–04–409–ECR (RAM), 2005 WL 8161739 (D. Nev. Dec. 5, 2005) ........................... 20

*Made in the USA Found. v. Gen. Motors, Corp.*
    No. Civ.A. 04–0553(JR), 2005 WL 3676030 (D.D.C. Mar. 31, 2005) ............................... 3, 5

*Oregon Advocacy Center v. Mink*
    322 F.3d 1101 (9th Cir. 2003) ................................................................................ 7

*O'Shea v. Littleton*
    414 U.S. 488 (1974) .............................................................................................. 8

*Overton v. Bazzetta*
    539 U.S. 126 (2003) ........................................................................................ 17, 18

*Parthemore v. Col*
    221 Cal. App. 4th 1372 (2013) .......................................................................... 4, 8, 9

*People v. Abbot*
    162 Cal. App. 3d 635 (1984) ................................................................................. 10

*People v. Dickson*
    91 Cal. App. 3d 409 (1979) .................................................................................. 10

*People v. Garvey*
    99 Cal. App. 3d 320 (1979) .......................................................................... 3, 11, 12

*People v. Loyd*
    27 Cal. 4th 997 (2002) ................................................................................. 3, 10, 11, 12

*People v. Sabo*
    185 Cal. App. 3d 845 (1986) ................................................................................. 10

*Phillips-Kerley v. City of Fresno*
    No. 1:18–CV–438 AWI BAM, 2018 WL 5255224 (E.D. Cal. Oct. 19, 2018) ......................... 9

*Prison Legal News v. Sec'y, Fla. Dep't of Corr.*
    890 F.3d 954 (11th Cir. 2018) ............................................................................... 20

*In re Qawi*
    32 Cal. 4th 1 (2004) ............................................................................................ 13

*R.A.V. v. City of St. Paul*
   505 U.S. 377 (1992) ................................................................................................. 17

*Raven v. Deukmejian*
   52 Cal. 3d 336 (1990) ............................................................................................... 13

*Reynolds v. Rios*
   No. 1:10–cv–00051–OWW, 2011 WL 617424 (E.D. Cal. Feb. 10, 2011) ...................... 2, 12

*Sacramento Cnty. Deputy Sheriff's' Ass'n v. Cnty. of Sacramento*
   51 Cal. App. 4th 1468 (1996) ............................................................................... 10, 13

*In re Serna*
   76 Cal. App. 3d 1010 (1978) ...................................................................................... 8

*Snow v. Woodford*
   128 Cal. App. 4th 383 (2005) ............................................................................... 13, 20

*Summers v. Earth Island Inst.*
   555 U.S. 488 (2009) ................................................................................................... 6

*Thompson v. Dep't of Corr.*
   25 Cal. 4th 117 (2001) ................................................................................... 3, 13, 20, 21

*Thornburgh v. Abbott*
   490 U.S. 401 (1989) ......................................................................................... 14, 15, 16

*Treglia v. Cate*
   No. C 11–3438 LHK (PR), 2012 WL 3731774 (N.D. Cal. Aug. 28, 2012) ...................... 12

*Turner v. Safley*
   482 U.S. 78 (1987) .......................................................................................... *passim*

*U.S. v. Ford*
   No.5:16CR326, 2021 WL 602927 (N.D. Ohio Feb. 16, 2021) ...................................... 19

*U.S. v. Gilliam*
   3:17–CR–258, 2020 WL 4570060 (M.D. Pa. Aug. 7, 2020) ........................................ 19

*U.S. v. Harrington*
   557 F. Supp. 3d 232 (D.N.H. 2021) ........................................................................... 19

*U.S. v. Joseph*
   978 F.3d 1251 (11th Cir. 2020) ................................................................................. 19

*U.S. v. Kumar*
   No. 15–CV–05780–LHK, 2016 WL 7369863 (N.D. Cal. Dec. 20, 2016) ......................... 5

*U.S. v. Lebron*
   492 F. Supp. 3d 737 (N.D. Ohio 2020) ....................................................................... 21

*U.S. v. Santiago*
   No. 4:17cr17, 2017 WL 2290140 (E.D. Va. May 25, 2017)...................................................... 19

*U.S. v. Stotts*
   925 F.2d 83 (4th Cir. 1991) ..................................................................................................... 20

*U.S. v. Yandell*
   No. 2:19–cr–00107 KJM, 2022 WL 1607923 (E.D. Cal. May 20, 2022)............................... 12

*Westinghouse Elec. Corp. v. Cnty. of Los Angeles*
   42 Cal. App. 3d 32 (1974) ............................................................................................... 4, 8, 9

*Williams v. Lew*
   819 F.3d 466 (D.C. Cir. 2016) ................................................................................................. 5

*Woods v. Horton*
   167 Cal. App. 4th 658 (2008).................................................................................................. 15

**Constitutions**

U.S. Const., Amend. I .................................................................................................*passim*

U.S. Const., Amend. IV ................................................................................................*passim*

Cal. Const., Art. I, § 2 ..................................................................................................*passim*

Cal. Const., Art. I, § 13 ................................................................................................*passim*

**Statutes and Regulations**

Cal. Penal Code § 2600 ................................................................................................*passim*

15 C.C.R. § 1073 .......................................................................................................................... 9

**Other Authorities**

*Governor Newsom Launches New Operation to Improve Public Safety and Target
   Fentanyl Trafficking Rings in San Francisco*, Office of Governor Gavin
   Newsom (April 28, 2023), https://www.gov.ca.gov/2023/04/28/sf-fentanyl-
   operation/.......................................................................................................................... 21

*Pelosi Urges Justice Department to Help Combat Fentanyl Cartels, Bring
   Operation Overdrive to San Francisco*, Congresswoman Nancy Pelosi,
   California's 11th District (April 28, 2023), https://pelosi.house.gov/news/press-
   releases/pelosi-urges-justice-department-to-help-combat-fentanyl-cartels-bring-
   operation.......................................................................................................................... 21

Richard H. Fallon, *Foreword: Implementing the Constitution*, 111 Harv. L. Rev.
   56, 79 (1997) ..................................................................................................................... 14

Austin Turner, *El Cerrito Resident Guilty in 2020 Peninsula Stabbing*, San Jose
   Mercury News (Sept. 21, 2022), 2022 WLNR 30094001 ...................................................... 8

<u>**NOTICE OF MOTIONS AND MOTIONS**</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on September 7, 2023 at 10:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 8 of the above entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA, 94102, Defendants the County of San Mateo and Christina Corpus, in her official capacity as Sheriff of San Mateo County (collectively "Defendants") will, and hereby do, move this Court to dismiss all of the claims for relief of A.B.O. Comix, Kenneth Roberts, Zachary Greenberg, Ruben Gonzalez-Magallanes, Domingo Aguilar, Kevin Prasad, and Wumi Oladipo's (collectively "Plaintiffs'") pursuant to Federal Rule of Civil Procedure 12(c). The Motion will be made on the grounds that Plaintiffs' Amended Complaint fails to plead facts sufficient to state any claim for relief. Additionally, Defendants will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff A.B.O. Comix's, Plaintiff Zachary Greenberg's, and Plaintiff's Wumi Oladipo's claims on the grounds that they all lack standing to pursue their claims.

These Motions are based on this Notice of Motions and Motions, the Memorandum of Points and Authorities, the Request for Judicial Notice and all exhibits attached thereto, the oral argument of counsel, and the pleadings and papers filed in this matter.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

As Judge Koh observed, "engag[ing] in forum shopping in an attempt to avoid legal precedent in [another] Circuit" is a dishonorable practice that "diminishes any deference owed to [a plaintiff's] choice of forum." *Burgess v. HP, Inc.*, 2017 WL 467845, at *9 (N.D. Cal. Feb. 3, 2017). That is exactly what Plaintiffs have attempted here. They initiated this suit, initially raising both California and federal claims, challenging San Mateo County's (the "County") policy of digitizing incoming inmate mail and providing copies to inmates on tablets and kiosks using Smart Communication's ("Smart") services. The County implemented this policy to prevent exposure to fentanyl and other opioids, which are easily introduced into jails by mail "through paper that ha[s] been soaked, sprayed or otherwise treated with illicit substances before being mailed to prisoners."

1 | *Human Rights Def. Center v. Bd of Cnty. Comm'rs*, __ F. Supp. 3d __, 2023 WL 1473863, at *1

2 | (D.N.H. Feb. 2, 2023) ("*HRDC*").

3 |  Plaintiffs' original Complaint ("OC") averred that the County's mail policy "violates the

4 | First Amendment" because "it is not rationally related to any legitimate penological goals" and

5 | "leaves no adequate alternatives to communication" and "violates the Fourth Amendment because

6 | it constitutes an unreasonable search and seizure of . . . information in which Plaintiffs and others

7 | maintain a reasonable expectation of privacy." OC ¶¶ 88, 91. After Defendants removed the action

8 | to federal court, Plaintiffs filed an Amended Complaint ("AC"), which omitted their federal

9 | claims. The AC claims the mail policy "serves no legitimate penological purpose,"[1] but "no longer

10 | raises claims under federal law" and instead brings identical claims "under Article I, Section 2 and

11 | Article I, Section 13 of the California Constitution."[2] Plaintiffs then moved to remand the case to

12 | state court, representing their "federal claims have been dropped." Dkt. 28 at 4:13.

13 |  Plaintiffs' jurisdictional gymnastics are a blatant attempt to evade controlling Ninth Circuit

14 | authority set forth in *Crime Justice & Am. v. Honea*, 876 F.3d 966, 976 (9th Cir. 2017), which is

15 | binding on this Court and is fatal to both their state and federal claims. *Honea* upheld Butte

16 | County's policy banning the delivery of certain types of inmate mail due to safety concerns. *Id.* at

17 | 969. As a substitute, the jail digitized the banned mail and installed "electronic kiosks" for inmates

18 | "to access electronic versions" of it. *Id.* at 971. The plaintiff argued Butte County's policy was an

19 | unlawful "suppression of expression" and served no "legitimate penological interests." *Id.* at 972–

20 | 73. The Ninth Circuit disagreed. Under the federal Constitution, "[r]egulations regarding the

21 | review of [prisoner's] mail are evaluated under the . . . test set forth in *Turner v. Safley*." *Reynolds*

22 | *v. Rios*, 2011 WL 617424, at *2 (E.D. Cal. Feb. 10, 2011). Applying the *Turner* test, *Honea* held

23 | Butte County's mail policy was "reasonably related to a legitimate penological objective" and that

24 | providing "kiosks" for review of "mail to inmates" is "an adequate substitute for regular

25 | distribution of paper copies." 876 F.3d at 970, 976, 978. Thus, Butte County's digitized mail

26 | policy "faithfully adhered to the *Turner* analysis." *Id.* at 972.

27 |

28 |

---

[1] AC ¶ 2.
[2] Dkt. 28 at 3:13–14, 2:15–17.

1    Seeking to sidestep *Honea*, the AC purports to assert "novel California constitutional

2  claims" that Plaintiffs represent are governed by substantively different rules than analogous

3  federal claims because inmate rights under "the state constitution's free speech and privacy

4  guarantees are . . . broader than . . . their federal analogs." Dkt. 32 at 2:2–3, 3:24–25. This

5  misrepresents hornbook law. California has codified prisoners' constitutional and statutory civil

6  rights in Penal Code § 2600, which provides that during "confinement," prisoners may be

7  "deprived of rights" if such deprivation "is reasonably related to legitimate penological interests."

8  Section 2600 is "designed to conform California law to the [U.S. Supreme Court's] decision in

9  *Turner*." *Cnty. of Nev. v. Superior Court*, 236 Cal. App. 4th 1001, 1009 n.2 (2015). Consequently,

10  *all* prisoner free-speech claims under California law are "governed by the high court's test in

11  *Turner*." *Thompson v. Dep't of Corr.*, 25 Cal. 4th 117, 130 (2001). Thus, the Ninth Circuit's

12  controlling decision in *Honea* likewise dooms Plaintiffs' state-law claims. *See* 876 F.3d at 971–73.

13  Plaintiffs' search-and-seizure claims also fail because California law applies the same bright-line

14  rule applicable to inmate Fourth Amendment cases: "a person incarcerated in a jail or prison

15  possesses no justifiable expectation of privacy," and consequently, inmate communications may

16  *always* be subjected to "official surveillance." *People v. Loyd*, 27 Cal. 4th 997, 1001–01 (2002).

17  Accordingly, "[e]xcept where [a] communication is a confidential one addressed to an attorney,

18  court or public official, a prisoner has no expectation of privacy with respect to letters posted by

19  [the prisoner]." *People v. Garvey*, 99 Cal. App. 3d 320, 323 (1979).

20    In addition to these fatal defects, Plaintiffs' claims must be dismissed for four other

21  independent reasons. First, lead-Plaintiff A.B.O. Comix ("A.B.O.") does not possess associational

22  standing to bring this suit because, among other things, it must plead facts showing that "it is a

23  properly formed organization with the corporate status and the members necessary to even attempt

24  to claim associational standing." *Made in the USA Found. v. Gen. Motors, Corp.*, 2005 WL

25  3676030, at *2 (D.D.C. Mar. 31, 2005). The AC pleads only that A.B.O. "is a collective of

26  artists." AC ¶ 5. A "*collective*" is not a "properly formed organization."

27    Second, Plaintiff Zachary Greenberg likewise lacks standing because he is no longer

28  incarcerated in the County's jails. AC ¶ 21. A plaintiff who "is no longer incarcerated in [a]

1   Jail . . . is not subject to the Jail's polic[ies]" and "has no standing to seek . . . injunctive relief"

2   regarding such policies. *King v. Baca*, 2001 WL 682793, at *3, *5 (C.D. Cal. June 12, 2001).

3        Third, Plaintiff Wumi Oladipo, who purportedly is Mr. Greenberg's "significant other,"

4   likewise lacks standing. *See* AC ¶ 86. Even if her relationship with Mr. Greenberg conferred

5   standing to challenge the mail policy while he was incarcerated in the County's jails, neither she

6   nor Mr. Greenberg are "subject to the Jail's [mail] polic[ies]" now. *See King*, 2001 WL 682793, at

7   *3, *5. Thus, she "has no standing to seek . . . injunctive relief" regarding such policies. *See id.*

8        Fourth, to bring a claim under California law, prisoners "must exhaust available

9   administrative remedies before filing a lawsuit." *Parthemore v. Col*, 221 Cal. App. 4th 1372, 1380

10  (2013). And "it is [the plaintiffs'] burden to plead and establish as a part of their case in chief that

11  they exhausted their administrative remedy" in order to state a prima facie case. *Westinghouse*

12  *Elec. Corp. v. Cnty. of Los Angeles*, 42 Cal. App. 3d 32, 37 (1974). Here, the County has

13  established a grievance procedure that enables "any inmate [to] file a grievance relating to

14  conditions of confinement," including "mail use procedures." Request for Judicial Notice ("RJN")

15  Ex. A at § 612.2. Plaintiffs' AC does not even acknowledge the County's grievance procedure—

16  much less plead that Plaintiffs have exhausted their remedies under that policy. Thus, Plaintiffs

17  have not satisfied their "burden to *plead* and establish as a part of their case in chief that they

18  exhausted their administrative remedy." *Westinghouse*, 42 Cal. App. 3d at 37 (emphasis added).

19  **II.     STATEMENT OF FACTS ALLEGED BY PLAINTIFFS**

20       "This case concerns San Mateo County's use of [Smart's] MailGuard service, which the

21  County uses to eliminate physical mail behind bars." AC ¶ 26. Before April 2021, non-legal mail

22  was "inspect[ed]" by jail staff "for the presence of drugs or other threats to facility security" and

23  "[o]nce approved, it was delivered" to the inmate." *Id.* ¶ 31. But in April 2021, the County

24  instituted a policy "to eliminate physical mail within its [jails]" and began "digitizing incoming

25  mail using [Smart's MailGuard] services." *Id.* ¶ 32. MailGuard "redirects physical mail" to

26  Smart's facility where it "open[s], scan[s], and upload[s] digital copies of the mail into a

27  proprietary database" for inspection by jail staff. *Id.* ¶ 26. Jail staff then "review mail" and "[i]f

28  approved, a digital copy of the mail may be accessed by its recipient, typically via tablets or

kiosks." *Id.* In 2021, "the County's then-Sheriff, Carlos Bolanos, announced that the County's mail policy [is] meant to "prioritize . . . safety and security" *Id.* ¶ 9. The County initiated the new mail policy "over concerns about 'fentanyl exposures.'" *Id.* County officials explained that the policy was initiated "to help keep everyone safe since there ha[ve] been some concerns regarding fentanyl exposures with the old mail system [the County's jails] w[ere] using." *Id.* ¶ 49.

## III.   ANALYSIS

### A.   Plaintiffs' Claims Should Be Dismissed Because They Are Not Justiciable

#### 1.   Lead Plaintiff-A.B.O. Lacks Associational Standing

To satisfy Article III's standing requirement, "a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Williams v. Lew*, 819 F.3d 466, 472 (D.C. Cir. 2016). To do so, a party must establish more than "a keen interest in the issue" being litigated. *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013). In particular, lead Plaintiff A.B.O. must satisfy Article III's associational standing requirements. At the outset, it must plead facts showing "it is a properly formed organization with the corporate status and the members necessary to even attempt to claim associational standing." *Made in the USA Found.*, 2005 WL 3676030, at *2. "[P]roperly formed" organizations recognized by our law include corporations (for-profit and non-profit), partnerships, and LLCs. *U.S. v. Kumar*, 2016 WL 7369863, at *8 (N.D. Cal. Dec. 20, 2016). But the AC pleads only that A.B.O. "is a collective of artists . . . ." AC ¶ 5. A "*collective*" is not a "properly formed organization." Indeed, the California Secretary of State has no record of any corporation, LLC, or limited partnership of record called "A.B.O. Comix" or "ABO Comix" that is authorized to do business in the State of California. *See* RJN Exs. B–C.

Even if A.B.O. could overcome this fatal defect (it cannot), it would still lack standing because it is required to demonstrate that Defendants' "behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021). An organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest*

1   *v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Instead, it must show "that it would

2   have suffered some other injury if it had not diverted resources to counteracting the problem." *Id*.

3   This occurs when the organization is "forced to choose between suffering an injury and diverting

4   resources to counteract the injury." *Id*. at 1088 n.4. In this case, A.B.O. failed to assert any factual

5   allegations in either its original or amended Complaints that it was forced to divert resources to

6   help its "members" because of the County's actions. Various paragraphs in the AC refer to its

7   "members" and alleged violations of *their* rights. But it does not allege a diversion of its resources

8   that would allow a court to conclude it pleaded organizational standing on its own behalf.

9          The associational standing doctrine also requires A.B.O. to establish that:

10                 (a) its members would otherwise have standing to sue in their own
                   right;

11                 (b) the interests it seeks to protect are germane to [its] purpose; and

12                 (c) neither the claim asserted nor the relief requested requires the
                   participation of individual members in the lawsuit.

13

14   *Assoc. Gen. Contractors v. Metro Water Dist.*, 159 F.3d 1178, 1181 (9th Cir. 1998). To meet the

15   first prong, A.B.O. "must show that a member suffers an injury-in-fact that is traceable to the

16   defendant and likely to be redressed by a favorable decision." *Id.* at 1194. To prove the requisite

17   injury to a member, A.B.O. must make "specific allegations establishing that at least one

18   identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S.

19   488, 498 (2009). To do so, A.B.O. must name specific members that would suffer alleged harm.

20   This is because, to establish standing, "an association must identify an affected member by name

21   and show that the member has suffered or will suffer harm." *Cal. Rifle & Pistol Ass'n, Inc. v. City

22   of Glendale* 2022 WL 18142541, at *2 (C.D. Cal., Dec. 5, 2022); *accord e.g.*, *Summers*, 555 U.S.

23   at 498 (no associational standing based on speculation unidentified members would be injured);

24   *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (affidavit provided to establish standing

25   was insufficient because it did not name specific persons harmed by the challenged program).

26          In addition, courts evaluate whether an organization's "members" possess "all of the

27   indicia of organization membership" such as "electing the members, being the only ones to serve

28   on the Commission, and financing its activities." *Hunt v. Wash. State Apple Advert. Com'n*, 432

U.S. 333, 334 (1977). These indicia satisfy "the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003).

Here, A.B.O. has failed to identify a single member that has suffered or would suffer harm. Instead, it characterizes itself as "a collective of artists that works to amplify the voices of incarcerated LGBTQ people through artistic expression. . . . It has nearly 450 incarcerated members, including at least one member incarcerated in Maple Street Correctional Center with whom [A.B.O.'s] staff has corresponded in the last year." AC ¶ 59. A.B.O. alleges its injuries are that the County's mail policy has "deterred members of the collective from expressing themselves as openly. [A.B.O.'s] staff and nonincarcerated members now hesitate to write as freely. . . ." *Id.* ¶ 62. These general allegations are clearly insufficient to establish associational standing. *See Assoc. Gen. Contractors v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1195 (9th Cir. 2013) (general allegations in complaint insufficient to establish associational standing).

Specifically, A.B.O. has failed to identify specific members that have allegedly been impacted by the mail policy as well as the specific harms suffered. A.B.O. has also not shown that it is "sufficiently identified with and subject to the influence" of the individuals it seeks to represent in this lawsuit. It has not shown that those individuals elect, serve, or finance its activities. None of the inmate-Plaintiffs allege they are A.B.O. members or that A.B.O. even represents their interests in this matter. Likewise, the AC does not allege what involvement, if any, the other Plaintiffs have with A.B.O. Nor does it provide any details regarding A.B.O.'s organizational structure or funding. These deficiencies demonstrate that A.B.O. lacks standing.

### 2.   Plaintiffs Zachary Greenberg and Wumi Oladipo Lack Standing

"Plaintiff Zachary Greenberg is currently incarcerated at Folsom State Prison"[3] following his conviction for assault with a deadly weapon,[4] and is no longer incarcerated in any of the

---

[3] AC ¶ 21.

[4] *See* Austin Turner, *El Cerrito Resident Guilty in 2020 Peninsula Stabbing*, San Jose Mercury News (Sept. 21, 2022), 2022 WLNR 30094001.

County's jails.[5] A plaintiff who "is no longer incarcerated in [a] Jail . . . is not subject to the Jail's polic[ies]" and "has no standing to seek . . . injunctive relief" regarding such policies. *King*, 2001 WL 682793, at *3, *5. This is because "[i]n the context of injunctive relief, a plaintiff has standing only when the possibility of future injury is particular and concrete." *O'Shea v. Littleton*, 414 U.S. 488, 496–97 (1974). "Past exposure to illegal conduct" is insufficient to establish "a present case or controversy regarding injunctive relief." *Id.* at 495–96. Plaintiff Wumi Oladipo, who purportedly is Mr. Greenberg's "significant other" also lacks standing. *See* AC ¶ 86. Assuming arguendo that her relationship with Mr. Greenberg conferred standing to challenge the mail policy while he was incarcerated in the County's jails, neither she nor Mr. Greenberg are "subject to the Jail's [mail] polic[ies]" now. *See King*, 2001 WL 682793, at *3, *5. Thus, the AC's admissions reveal that Mr. Greenberg and Ms. Oladipo both lack standing and their claims must be dismissed.

### 3.    Plaintiffs Failed to Exhaust Their Administrative Remedies

To bring a claim under California law regarding the terms of confinement, a prisoner "must exhaust available administrative remedies before filing a lawsuit." *Parthemore*, 221 Cal. App. 4th at 1380. This rule applies "even when the grievances involve an alleged constitutional violation." *In re Serna*, 76 Cal. App. 3d 1010, 1014 (1978). In addition, "where remedy by appeal is available" under a grievance policy, the plaintiff must also exhaust all avenues of appeal under the policy "before redress may be had in the courts." *Blake v. PUC of City & Cnty. of San Francisco*, 120 Cal. App. 2d 671, 673 (1953).

Under California law, "failure to exhaust administrative remedies" is *not* merely "an affirmative defense." *Westinghouse*, 42 Cal. App. 3d at 37. Rather, when a plaintiff sues a state agency that provides a grievance procedure, exhaustion of all avenues of review under that procedure is an element of the plaintiff's case in chief. *Id.* In such cases, "it is [the plaintiffs'] burden to plead and establish as a part of their case in chief that they exhausted their administrative remedy" in order to state a prima facie case. *Id.* "Under California law, the requirement of exhaustion of administrative remedies is a jurisdictional prerequisite to resort to the courts." *Phillips-Kerley v. City of Fresno*, 2018 WL 5255224, at *4 (E.D. Cal. Oct. 19, 2018). For

---

[5] AC ¶ 21.

this reason, California courts recognize that a prisoner's "failure to exhaust administrative remedies is a proper basis for [dismissal]" for failure to state a claim upon which relief may be granted. *Parthemore*, 221 Cal. App. 4th at 1379.

California law dictates that jails "shall develop written policies and procedures whereby all incarcerated persons have the opportunity and ability to submit and appeal grievances relating to any conditions of confinement, including but not limited to: . . . mail . . . procedures . . . ." 15 C.C.R. § 1073. Pursuant to this law, the County has established a grievance procedure which enables "any inmate [to] file a grievance relating to conditions of confinement," including "mail use procedures." RJN Ex. A at § 612.2. To initiate the procedure, an inmate must "complete[] [an] inmate grievance form" which must "be filed . . . within 14 days of the complaint or issue." *Id.* at § 612.3, § 612.3.2. The procedure dictates that "[u]pon receiving a completed inmate grievance form, the supervisor shall ensure that the grievance is investigated and resolved or denied in a timely manner, as established by the Division Commander." *Id.* at § 612.3.2. It further provides: "Inmates may appeal the finding of a grievance to the Division Commander as the final level of appeal within five days of receiving the findings of the original grievance. The Division Commander will review the grievance and either confirm or deny it." *Id.* at § 612.3.3.

Plaintiffs' AC does not even acknowledge the existence of the County's grievance procedure—much less plead that they have exhausted their rights pursuant to that procedure, including their rights of appeal. Accordingly, Plaintiffs have not satisfied their "burden to plead and establish as a part of their case in chief that they exhausted their administrative remedy." *Westinghouse*, 42 Cal. App. 3d at 37. As such, their claims must be dismissed. *See Parthemore*, 221 Cal. App. 4th at 1379; *accord Phillips-Kerley*, 2018 WL 5255224, at *4.

**B.      Plaintiffs' Claims Fail on the Merits as a Matter of Law**

Even if the justiciability defects in the AC were not fatal to Plaintiffs' claims (they are), their claims still must be dismissed because they are barred on the merits as a matter of law.

**1.      Plaintiffs' Search-and-Seizure Claim Is Patently Frivolous**

Plaintiffs dedicate nearly a third of their AC—some 28 of their 90 paragraphs—to asserting the County's mail policy is an "invasion of privacy" and thus "constitutes an

unreasonable search and seizure of correspondence and other information in which Plaintiffs and others maintain a reasonable expectation of privacy" in violation of Article I, § 13 of the California Constitution. AC ¶¶ 48, 90; *accord e.g.*, *id.* ¶¶ 2, 6–9, 12, 29–30, 33, 41, 43–47, 57, 62, 64, 68, 72, 75, 79, 81–82, 86–87. This contention is frivolous.

Article I, § 13 is California's "counterpart to the Fourth Amendment['s]" search-and-seizure clause. *People v. Sabo*, 185 Cal. App. 3d 845, 448 n.1 (1986). Like the Fourth Amendment, a claim under Article I, § 13 turns on whether the person invoking its protection had "a reasonable expectation of privacy." *People v. Abbot*, 162 Cal. App. 3d 635, 639 (1984); *accord Faunce v. Cate*, 222 Cal. App. 4th 166, 171 (2013) ("to allege an actionable violation of [the] right to privacy under . . . the California Constitution," plaintiffs "must show [they] had a reasonable expectation of privacy"). This is because a "search," within the meaning of § 13, only occurs when a government agent intrudes upon a "sphere" in which society recognizes "a reasonable expectation of privacy." *People v. Dickson*, 91 Cal. App. 3d 409, 414 (1979). "Determining whether an expectation of privacy is . . . 'reasonable' necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy." *Sacramento Cnty. Deputy Sheriff's' Ass'n v. Cnty. of Sacramento*, 51 Cal. App. 4th 1468, 1480, 1485 (1996) (quoting *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984)). And in jails, both the federal and the California Constitutions "strike [that] balance in favor of institutional security," because jail security "is 'central to all other corrections goals.'" *Sacramento Cnty.*, 51 Cal. App. 4th at 1480 (quoting *Hudson*, 468 U.S. at 527–28).

Accordingly, California law, like the Fourth Amendment applies a bright-line rule to inmate claims: "***a person incarcerated in a jail or prison possesses <u>no justifiable expectation of privacy</u>***." *Loyd*, 27 Cal. 4th at 1001 (emphasis added). A person "detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in society" because the "lack of privacy is a necessary adjunct to . . . imprisonment." *Id.* Because it is settled under California law that communications with inmates do "not enjoy a justifiable expectation of privacy," such communications may always be subjected to "official surveillance." *Id.* at 1002. California law does not impede such "surveillance" in any way. *Id.* at 1004, 1010.

1    In *Loyd*, an inmate who was incarcerated in a "jail awaiting trial," asserted that authorities

2    violated California law by "secretly monitoring" her communications "with her nonattorney

3    visitors" for the sole "purpose of gathering evidence" against her. *Id.* at 999–1000. California's

4    High Court rejected this contention, holding that California's laws governing "surveillance" of

5    inmate communications "conformed to federal law." *Id.* at 1003–04, 1010. And this law

6    recognizes, as explained above, that inmate communications do "not enjoy a justifiable

7    expectation of privacy." *Id.* at 1002, 1010. This is because "it is obvious that a jail shares none of

8    the attributes of privacy of a home, an automobile, an office, or a hotel room" and that "[i]n

9    prison, official surveillance has traditionally been the order of the day." *Id.* at 1002 (quoting *Lanza*

10   *v. State of N.Y.*, 370 U.S. 139, 143 (1962)). And "[w]hile the deprivation of a prisoner's rights or

11   privileges requires penological objectives, the legitimacy of jailhouse monitoring of inmate

12   [communications] is based on precisely these objectives." *Loyd*, 27 Cal. 4th at 1004 (citation

13   omitted). Accordingly, "***California law . . . permits law enforcement officers to monitor and***

14   ***record unprivileged [inmate] communications*** *without limitation*—even when such

15   "surveillance" is unrelated "to the maintenance of institutional security" and is for the sole purpose

16   of "gather[ing] evidence of crime." *Id.* at 1003–04, 1010 (emphasis added).

17   This bright-line rule applies with equal vigor to non-legal inmate mail, which is simply

18   another form of surveillable inmate communication. In *Garvey*, a prisoner "in jail awaiting trial"

19   for attacking a man in a bar "wrote to a friend" admitting that he "kick[ed] [the victim] in the

20   head." 99 Cal. App. 3d at 322. "The jailer monitoring outgoing mail copied [the prisoner's] letter"

21   and provided it to the prosecutor. *Id.* The letter was admitted against the prisoner at trial, and he

22   was convicted. *Id.* The court in *Garvey* held that the jailers' surveillance of the letter did not

23   violate any of the prisoner's rights. This is because "***[e]xcept where the communication is a***

24   ***confidential one addressed to an attorney, court, or public official, a prisoner has no***

25   ***expectation of privacy with respect to letters posted by [the prisoner]***." *Id.* at 323 (emphasis

26   added). So too here. Accordingly, Plaintiffs' search-and-seizure claims are patently frivolous.[6]

27

28   ─────────────────────────────────
     [6] As *Loyd* and *Garvey* show, California law is in accord with the "'bright line' rule" which

### 2.    Plaintiffs' Free-Speech Claim Fails as a Matter of Law

Plaintiffs claim the mail policy "violates Article I, Section 2 of the California Constitution" because it inhibits inmates' freedom "to express themselves" and "is not rationally related to any legitimate penological goals." AC ¶¶ 2, 89. They represent that this count "raises novel claims under [California law] regarding the constitutionality of the County's decision to [digitize] non-legal physical mail"[7] and that these claims are governed by substantively different rules than analogous claims under the First Amendment because inmate rights under "the state constitution's free speech . . . guarantees are . . . broader than . . . their federal analogs."[8] Not so.

Article I, § 2 "is equivalent to the First Amendment's free speech clause." *Gerawan Farming Inc. v. Lyons*, 24 Cal. 4th 468, 512 (2000). First Amendment law recognizes that "[r]egulations regarding the review of [prisoner's] incoming mail are evaluated under the . . . test set forth in *Turner v. Safley*." *Reynolds*, 2011 WL 617424, at *2; *accord In re Collins*, 86 Cal. App. 4th 1176, 1178, 1182 (2001). California codified prisoners' constitutional and statutory civil rights in Penal Code § 2600, which provides that during "confinement" inmates may be "deprived of rights" if such deprivation "is reasonably related to legitimate penological interests." Section 2600 is "designed to conform California law to the decision in *Turner*." *Cnty. of Nev.*, 236 Cal. App. 4th at 1009 n.2. Plaintiffs claim § 2600 "does not . . . interpret the *state constitution's independent guarantee of rights*." Dkt. 32 at 4:16–19 (emphasis added). Not so. California's

---

governs Fourth Amendment jurisprudence. *See Hudson*, 468 U.S. at 523. The Fourth Amendment, like California law, dictates that "prisoners have no legitimate expectation of privacy"—not even in "their cells and lockers." *Id.* at 529–30. As a consequence, they cannot "invoke the protections of the Fourth Amendment." *Id.* And, as Judge Koh ruled, *Hudson*'s axiom, like its California law analog applied in *Loyd* and *Garvey*, "applies equally to an inmate's incoming mail." *Treglia v. Cate*, 2012 WL 3731774, at *3 (N.D. Cal. Aug. 28, 2012). This is because "inmates well know that their permitted communications with people outside the prison," including "non-legal mail" are always "subject to monitoring." *U.S. v. Yandell*, 2022 WL 1607923, at *4 (E.D. Cal. May 20, 2022). Thus, as Judge Patel held, "*[i]t is settled law that prisoners have no legitimate expectation of privacy in their [nonprivileged] correspondence*." *Crump v. Gomez*, 1995 WL 274359, at *2 (N.D. Cal. April 27, 1995) (citation omitted) (emphasis added). This is because the state's security interest "justifies [the] minor burden placed on [a prisoner's] freedom to communicate with friends and relatives." *Id.* (citation omitted). Thus, jail officials "cannot be held liable for reading [a prisoner's] non-privileged correspondence." *Id.*

[7] Dkt. 28 at 5:4–5, 5:11–12.
[8] Dkt. 32 at 3:24–25.

Supreme Court held that § 2600 embodies **the sum total of _all_** "**statutory _as well as constitutional_**

**_rights_**" enjoyed by prisoners under California law. *In re Qawi*, 32 Cal. 4th 1, 21 (2004) (emphasis

added). Thus, *all* inmate free-speech claims under California law are "governed by the high

court's test in *Turner*." *Thompson*, 25 Cal. 4th at 130 (2001). This includes claims under the

"California constitution." *Snow v. Woodford*, 128 Cal. App. 4th 383, 389, 390 n.3 (2005).

While California sometimes "*may* choose to depart" from U.S. Supreme Court doctrine in

"interpreting" constitutional rights available under its own law, it has *not* done so with regard to

the specific law governing this case. *See* Dkt. 28 at 6:15–16 (emphasis added). Rather, the

controlling law here falls under the much more common maxim that recognizes when a California

and a federal constitutional provision are substantially similar, there usually is "no basis for a

broader interpretation of the California [provision]" because "California courts look to [U.S.]

Supreme Court authority interpreting the [analogous] federal constitutional provision" when

"[i]nterpreting [a] California constitutional provision." *21st Cent. Ins. Co. v. Superior Court*, 127

Cal. App. 4th 1351, 1357 n.2 (2005). "The general policy is that 'cogent reasons must exist before

a state court in construing a provision of the state Constitution will depart from the construction

placed by the Supreme Court of the United States on a similar provision in the federal

Constitution.'" *Sacramento Cnty.*, 51 Cal. App. 4th at 1485–86 (quoting *Raven v. Deukmejian*, 52

Cal. 3d 336, 353 (1990)). Such cogent reasons do *not* exist here because California's Supreme

Court has unanimously held that *all* prisoner civil rights claims under California statutory and

constitutional law are "governed by the high court's test in *Turner*." *Thompson*, 25 Cal. 4th at 130.

### a.    The *Turner* Test

*Turner* is "a rational-basis test." *Evans v. Skolnik*, 997 F.3d 1060, 1071 n.8 (9th Cir. 2021).

Under it, a "regulation is valid if it is reasonably related to legitimate penological interests."

*Turner*, 482 U.S. at 89. A regulation subject to such review may only be invalidated if a challenger

can prove that its purpose and its requirements are "so remote as to render the policy arbitrary or

irrational." *Id.* at 89–90. "[J]udicial scrutiny under [such] rational basis review is typically so

deferential as to amount to a virtual rubber stamp." Richard H. Fallon, *Foreword: Implementing

the Constitution*, 111 Harv. L. Rev. 56, 79 (1997).

1    The *Turner* test requires courts to evaluate regulations under four factors:

2         (1) whether there is a valid, rational connection between the
          [challenged] policy and the legitimate governmental interest put
3         forward to justify it;

4         (2) whether there are alternative means of exercising the right;

5         (3) whether accommodating the asserted right will have an impact
          on guards, other inmates and allocation of prison resources; and
6
          (4) whether the policy is an "exaggerated response" to the prison's
7         concerns.

8    *In re Furnace*, 185 Cal. App. 4th 649, 664 (2010). "California cases" applying *Turner* "have . . .

9    stressed the need for courts to defer to prison authorities in running the prison system." *In re*

10   *Jenkins*, 50 Cal. 4th 1167, 1175 (2010). This deference is mandated by the California

11   Constitution's "separation of powers," which, like its federal analog, recognizes that "'[r]unning a

12   prison is an inordinately difficult undertaking that requires expertise, planning, and the

13   commitment of resources, all of which are particularly within the province of the legislative and

14   executive branches of government.'" *Id.* (quoting *Turner*, 482 U.S. at 84–85). Operation of jails is

15   "a task that has been committed to the responsibility of those branches." *Jenkins*, 50 Cal. 4th at

16   1175 (quoting *Turner*, 482 U.S. at 84–85). Thus, California law mandates "deference" to jail

17   administrators that "limits judicial intervention to demonstrate instances of actions by prison

18   officials that are arbitrary, capricious, irrational, or an abuse of discretion granted those given the

19   responsibility of operating prisons." *Jenkins*, 50 Cal. 4th at 1175.

20       Accordingly, *Turner* demands that courts show "sensitivity to 'the delicate balance that

21   administrators must strike between the order and security of the internal prison environment and

22   the legitimate demands of those on the 'outside' who seek to enter that environment, in person or

23   through the written word.'" *Collins*, 86 Cal. App. 4th at 1182 (quoting *Thornburgh v. Abbott*, 490

24   U.S. 401, 407 (1989)). Courts must acknowledge "certain proposed interactions, though seemingly

25   innocuous to laymen, have potentially significant implications for the order and security of the

26   prison." *Collins*, 86 Cal. App. 4th at 1182. Thus, courts must afford "'considerable deference to

27   the determinations of prison administrators who, in the interest of security, regulate the relations

28   between prisoners and the outside world.'" *Id.* (quoting *Thornburgh*, 490 U.S. at 407–08).

1      Denying such deference "'would seriously hamper" jail administrators' "ability to

2 anticipate security problems and to adopt innovative solutions to the intractable problems of prison

3 administration.'" *Woods v. Horton*, 167 Cal. App. 4th 658, 673 (2008) (quoting *Turner*, 481 U.S.

4 at 89). This would "distort the decision making process, for every administrative judgment would

5 be subject to the possibility that some court somewhere would conclude that it had a less

6 restrictive way of solving the problem at hand." *Turner*, 481 U.S. at 89. Here, the allegations of

7 Plaintiffs' AC amount to admissions that the mail policy satisfies *Turner*'s and Penal Code

8 § 2600's deferential rational basis test as a matter of law.

9            **b.**    ***Honea* and *HRDC* Prove the County's Mail Policy Is Reasonably**

10                  **Related to a Legitimate Penological Interest as a Matter of Law**

11      The recent decision in *HRDC* and the Ninth Circuit's controlling decision in *Honea*,

12 establish that the County's mail policy satisfies *Turner* and § 2600 as a matter of law. In *HRDC*,

13 the court upheld a strikingly similar mail policy implemented by Stratford County, New

14 Hampshire. *See HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *1. Stratford's policy "*ban[ned]*

15 *all incoming inmate mail*, including books and other publications." *Id.* (emphasis added). The

16 jailers did this because they were "concerned about the security risk posed by incoming inmate

17 mail" since narcotics, particularly fentanyl, can enter the jail "through paper that ha[s] been

18 soaked, sprayed, or otherwise treated with illicit substances before being mailed to prisoners." *Id.*

19 "***The solution came in the form of electronic tablets***." *Id.* at *2 (emphasis added). Like the

20 County's mail policy at issue here, Stratford began digitizing "all incoming (non-legal) mail" and

21 made it available on "electronic tablets the Jail provides to all its inmates." *Id.* at *1–*2. The court

22 held this policy satisfied *Turner*'s rational-basis test because "restricting inmate access to opioids

23 like Suboxone and fentanyl" is a "legitimate penological interest[] under *Turner*," and by allowing

24 inmates to send and receive mail digitally using "electronic tablets," the jail "provide[d] prisoners

25 with alternate ways to exercise the infringed-upon right." *Id.* at *2, *7–8.

26      The Ninth Circuit's controlling decision in *Honea* confirms *HRDC* was rightly decided.

27 *Honea* concerned a Butte County policy "prohibiting delivery of unsolicited commercial mail to

28 inmates." 876 F.3d at 969. As a substitute, the jail digitized the banned materials and installed

"electronic kiosks" for inmates "to access electronic versions" of the mail. *Id.* at 971. Butte County's ban was motivated by much less serious security threats than those involved in *HRDC* and in the case at bar. The jail was concerned, inter alia, that inmates may "use paper to cover windows, speakers, and lights, to clog toilets," or "start fires." *Id.* at 970.

The plaintiff claimed "the jail's [mail] ban" infringed on inmates' free-speech rights. *Id.* at 971. But, applying the *Turner* test, the Ninth Circuit held Butte County's policy was "reasonably related to a legitimate penological objective" and providing "kiosks" for review of "mail to inmates" is "an adequate substitute for regular distribution of paper copies." *Id.* at 970, 976, 978. Thus, Butte County "faithfully adhered to the *Turner* analysis" in enacting its digital-mail policy. *Id.* at 972. As explained in more detail below, *HRDC* and *Honea* conclusively establish that the County's mail policy at issue in this case satisfies the *Turner* test and § 2600 as a matter of law.

     c.     **The Policy Satisfies All the *Turner* Factors as a Matter of Law**

     (i)     **The Mail Policy Furthers Neutral and Legitimate State Objectives and Is Rationally Related to Those Objectives**

The first *Turner* factor asks whether "the regulation [is] reasonably related to legitimate security interests." *Turner*, 482 U.S. at 91. In determining whether an objective is legitimate, courts must "'[a]cknowledge[] the expertise of prison officials.'" *Collins*, 86 Cal. App. 4th at 1182 (quoting *Thornburgh*, 490 U.S. at 407). This is because "courts are ill equipped to deal with the complex and difficult problems of prison administration" and based on their "expertise," jail officials may reasonably conclude that "certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Collins*, 86 Cal. App. 4th at 1182. Plaintiffs plead that the County "'change[d] . . . the way'" inmates "'receive mail' to 'prioritize the safety and security of those in our correctional facilities.'" AC ¶ 49 (purporting to quote Defendants). Specifically, the County initiated the new mail policy "over concerns about 'fentanyl exposures.'" *Id.* ¶ 9. The policy changes were made "'to help keep everyone safe since there ha[ve] been some concerns regarding fentanyl exposures with the old mail system [the jails] were using.'" *Id.* ¶ 49 (purporting to quote Defendants).

This objective is both "neutral" and "legitimate." *See Turner*, 482 U.S. at 90. It is "neutral"

because it applies "without regard to the content of the expression."[9] *See id.* And "[c]ourts have routinely found that maintaining prison security" and "deterring drug use within prisons . . . are legitimate penological interests." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *6 (citing *Turner*, 482 U.S. at 90; *Overton v. Bazzetta*, 539 U.S. 126, 134 (2003); *Beard v. Banks*, 548 U.S. 521, 530 (2006)). California courts likewise agree mitigating the introduction of "drugs into . . . prison" is a legitimate penological interest. *In re Espinoza*, 192 Cal. App. 4th 97, 108 (2011). Thus, it is beyond cavil that "restricting inmate access to opioids like . . . fentanyl in particular are legitimate penological interests." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *7.

The policy is "rationally related" to the objective of protecting prisoners and staff from "fentanyl exposures." In light of "the significant deference granted to corrections officials," courts cannot weigh evidence in determining whether the rational-relationship requirement is met. *Id.* at 6. All that is required is that "the regulation has a logical connection to" a "legitimate government interest[]." *Friend v. Kolodzieczak*, 923 F.2d 126, 127 (9th Cir. 1991). It "makes logical sense" that "bann[ing] all incoming personal inmate mail" will reduce "inmate access to opioids." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *2, *7, *8. Fentanyl is introduced into jails "through paper that ha[s] been soaked, sprayed or otherwise treated with illicit substances before being mailed to prisoners." *Id.* at *1. And there can be no doubt fentanyl "introduction pose[s] a risk to the health, safety, and security of [a] Jail's prisoners and staff." *Id.* at *7. Thus, "a rational relationship" exists "between the policy" and "legitimate penological interests." *See id.*

### (ii)   The Policy Provides Alternative Means for Prisoners to Exercise Their Right to Use the Mail

"The second *Turner* factor asks 'whether there are alternative means that remain open to prison inmates.'" *Honea*, 876 F.3d at 975–76 (quoting *Turner*, 482 U.S. at 90). Where jail officials have provided such alternative avenues, "courts should be particularly conscious of the measure of

---

[9] A regulation is "neutral" if it imposes legitimate time, place, and manner restrictions on a particular medium of expression "without regard to [the] content" of the communications using the regulated medium. *Collins*, 86 Cal. App. 4th at 1185. For example, a state may impose volume restrictions on a "noisy sound truck," but it may not impose volume restrictions that differ "based on hostility—or favoritism—towards the underlying message expressed" by the truck. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992).

1   judicial deference owed to corrections officials . . . in gauging the validity of the regulation."

2   *Turner*, 482 U.S. at 90. The alternative "need not be ideal"—it "need only be available." *Overton*,

3   539 U.S. at 135. When a policy "limits a form of communication, the prison need not offer an

4   identical alternative." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *6. It only needs to "offer

5   other means of communication generally, such that the regulation does not result in a ban on

6   expression altogether." *Id.* Moreover, "*Turner* does not require that the alternative avenue provide

7   exactly the same level of communication as the plaintiff's preferred method, only that other means

8   of expression be available." *Honea*, 876 F.3d at 976.

9        Plaintiffs conclusorily assert that the mail policy "leaves no adequate alternatives to

10   communication via physical mail." AC ¶ 89. But *Honea* proves that this assertion is untrue as a

11   matter of law. Like in *HRDC* and *Honea*, the County has not banned prisoners from sending or

12   receiving mail altogether. Rather, the County provides the same communications in a different

13   form. It "digitiz[es] incoming mail" and provides these digitized copies to prisoners "via tablets or

14   kiosks." AC ¶¶ 26, 32. In *Honea*, the Ninth Circuit held providing "kiosks" *alone* for prisoners to

15   review "mail to inmates" is "an adequate substitute for regular distribution of paper copies." 876

16   F.3d at 970, 976. Kiosks "provide a meaningful way" for prisoners and non-prisoners to

17   communicate. *Id.* at 976. Likewise, the *HRDC* court held that making digitized copies of inmate

18   mail "available on . . . electronic tablet[s]" *alone* "more than satisfie[s] [*Turner*'s] second prong."

19   *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *8. Here, the County provides inmates with

20   digitized copies of mail on *both* "tablets" *and* "kiosks." AC ¶¶ 26, 32. Thus, as a matter of law, the

21   County has "more than satisfied [*Turner*'s] second prong." *See HRDC*, __ F. Supp. 3d __, 2023

22   WL 1473863, at *8; *accord Honea*, 876 F.3d at 970, 976.

23                              **(iii)      An Accommodation Would Endanger Inmates and Staff**

24        "The third *Turner* factor requires [courts] to consider 'the impact accommodation of the

25   asserted constitutional right will have on guards and other inmates, and on the allocation of prison

26   resources generally.'" *Honea*, 876 F.3d at 976 (quoting *Turner*, 482 U.S. at 90). A policy passes

27   this test when accommodating the inmate would come "at a cost of increased risk of danger to the

28   inmate population as well as the staff." *Chau v. Young*, 2014 WL 4100635, at *5 (N.D. Cal. Aug.

20, 2014). A policy likewise satisfies this test if accommodating the inmate would require "that additional time and resulting expense would . . . have to be spent searching . . . for contraband" because the materials requested by the inmate are "'serviceable for smuggling . . . drugs'" or other "'contraband into [the] institution'" and are "'difficult to search effectively.'" *Antonetti v. McDaniels*, 2021 WL 624241, at *13 (D. Nev. Jan. 25, 2021) (quoting *Bell v. Wolfish*, 441 U.S. 520, 551 (1979)). The County's mail policy satisfies both these criteria.

"Narcotics introduction pose[s] a risk to the health, safety, and security of the Jail's prisoners and staff." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *1. As Judge Breyer found: "Fentanyl is deadly. While heroin generally contains only 5%–15% active drug, fentanyl is often 100% pure." *City & Cnty. of San Francisco v. Purdue Pharma, L.P.*, 620 F. Supp. 3d 936, 22 U.S. Dist. LEXIS 142962, at *32 (N.D. Cal. 2022) (citation omitted). It is "100 times more potent than morphine and as much as 50 times more potent than heroin." *Id.* Even "[a] dash of fentanyl—not much larger than a few grains of sand—can be fatal. " *Id.* at *33. This shows accommodating Plaintiffs' demands would increase the risk of fentanyl entering the jail, which poses deadly consequences. This also would substantially raise the risks faced by jail staff. Plaintiffs represent "*[o]n information and belief*" that there is "consensus that incidental fentanyl exposure does not pose a health risk." AC ¶ 9 (emphasis added). But, as courts have repeatedly found, this fanciful assertion is false. Material containing "suspected fentanyl" must be handled with extreme caution "because death can result if just a small amount makes contact with a person's skin." *U.S. v. Joseph*, 978 F.3d 1251, 1260 (11th Cir. 2020). Cases recognizing this proposition are legion.[10]

Accommodating Plaintiffs' demands would also require the jail "to allocate more time, money, and personnel" to detect and prevent fentanyl. *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *8 (quoting *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 973 (11th

---

[10] *E.g.*, *U.S. v. Harrington*, 557 F. Supp. 3d 232, 333 (D.N.H. 2021) ("fentanyl can . . . be harmful if exposed to human skin"); *U.S. v. Ford*, 2021 WL 602927, at *3 (N.D. Ohio Feb. 16, 2021) ("fentanyl . . . when absorbed through the skin when law enforcement comes in contact with it . . . can be fatal"); *U.S. v. Gilliam*, 2020 WL 4570060, at *24 (M.D. Pa. Aug. 7, 2020) ("fentanyl" is "extremely dangerous and even fatal through mere contact with human skin and pose[s] an additional risk if the substance were to become airborne"); *U.S. v. Santiago*, 2017 WL 2290140, at *3 (E.D. Va. May 25, 2017) ("Fentanyl is a legitimate safety concern because it causes harm through direct skin contact.").

Cir. 2018)). Visually "inspecting incoming mail" for fentanyl is ineffective because "methods for disguising narcotic-treated paper [have] grown increasingly sophisticated and visual inspection often fail[s]." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *1. And buying machines "to scan incoming mail for narcotics" is prohibitively expensive and, critically, such machines "[can]not detect fentanyl." *Id.* Thus, *Turner*'s and § 2600's third factor is satisfied as a matter of law.

### (iv)     The Policy Is Not an Exaggerated Response

The final *Turner* factor asks "whether the regulation is an exaggerated response to [the jail's] concerns." *Snow*, 128 Cal. App. 4th at 393. Invoking this factor, Plaintiffs plead (again) "*[o]n information and belief*" that "mail is not a significant source of fentanyl or other drugs in San Mateo County's jails" and that there is no evidence "that fentanyl [is] a significant problem within . . . the County's jails." AC ¶¶ 9, 50 (emphasis added). These self-serving and fanciful allegations are irrelevant. *Turner* does not require officials "to wait until there is a breach of security . . . in order to take preventative measures." *Loehr v. Nev.*, 2005 WL 8161739, at *9 (D. Nev. Dec. 5, 2005). Thus, "courts do not require an actual breach of security before upholding a regulation designed to prevent it."[11] *Kuperman v. Wrenn*, 645 F.3d 69, 75 (1st Cir. 2011). *Turner* enables jail staff "to anticipate security problems and to adopt innovative solutions" before a dangerous event occurs. *Thompson*, 25 Cal. 4th at 134. Thus, "*Turner* does not require the Jail to prove prior instances of narcotics introduction" through the mail "before enacting a policy to prevent such an eventuality." *HRDC*, __ F. Supp. 3d __, 2023 WL 1473863, at *8. Even if the jail's concern about "materials containing contraband" being mailed to prisoners "was hypothetical in nature, the possibility that such a thing could happen makes logical sense." *Id.*

It is beyond dispute that "[t]he opioid crisis has infiltrated communities throughout the country," including the Bay Area. *City & Cnty. of San Francisco, v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 629 (N.D. Cal. 2020). And "it is common knowledge that fentanyl is particularly

---

[11] *See, e.g.*, *Prison Legal News*, 890 F.3d at 968 ("The *Turner* standard does not require the Department to present evidence of an actual security breach to satisfy the first factor."); *U.S. v. Stotts*, 925 F.2d 83, 87 (4th Cir. 1991) (courts "will not require that an actual breach of security occur before upholding regulations designed to prevent it"); *HRDC*, __. F. Supp. 3d __, 2023 WL 1473863, at *6 (same).

deadly." *Commonwealth v. Burton*, 234 A.3d 824, 833 (Pa. Sup. Ct. 2020). "Between 1999 and 2016, more than 350,000 people died from opioid-related overdoses—2017, alone, added nearly 48,000 people to the total number of opioid-related deaths." *Purdue Pharma L.P.*, 491 F. Supp. 3d at 629. Thus, courts routinely take "judicial notice that heroin/fentanyl addiction in this country has reached crisis levels and that Fentanyl is an especially addicting, dangerous, and unpredictable opiate that has exacerbated the crisis, resulting in many deaths." *U.S. v. Lebron*, 492 F. Supp. 3d 737, 740 (N.D. Ohio 2020). Indeed, the crisis is so severe that Governor Newsom, exercising his powers as the State's Commander-in-Chief, recently deployed the National Guard "to combat fentanyl trafficking in San Francisco."[12] Similarly, Speaker-of-the-House-Emerita Pelosi asked the Justice Department to deploy "enhanced federal resources" to "San Francisco to combat fentanyl trafficking" because the opioid crisis's effects on the Bay Area are so grave that "local officials and law enforcement" are insufficient, necessitating a "whole of government approach."[13]

Jails obviously are not immune from this epidemic. As Judge Breyer observed, "[n]ot only has the opioid crisis impacted San Francisco's streets, but [its] jails are seeing an influx of opioid contraband." *Purdue Pharma L.P.*, 491 F. Supp. 3d at 629. Accordingly, there can be no doubt that it was proper for the County "to anticipate security problems" presented by fentanyl "and to adopt innovative solutions" before tragedy strikes. *See Thompson*, 25 Cal. 4th at 134. Thus, the mail policy satisfies *Turner*'s final factor as a matter of law.

Because, for the reasons explained above, "all four *Turner* factors favor [Defendants]" as a matter of law, § 2600 dictates that Plaintiffs "cannot prevail" on their free speech claim and, as such, it must "be dismissed for failure to state a claim upon which relief may be granted." *See Fields v. Paramo*, 2019 WL 4640502, at *6 (E.D. Cal. Sept. 24, 2019).

---

[12] *Governor Newsom Launches New Operation to Improve Public Safety and Target Fentanyl Trafficking Rings in San Francisco*, Office of Governor Gavin Newsom (April 28, 2023), https://www.gov.ca.gov/2023/04/28/sf-fentanyl-operation/.

[13] *Pelosi Urges Justice Department to Help Combat Fentanyl Cartels, Bring Operation Overdrive to San Francisco*, Congresswoman Nancy Pelosi, California's 11th District (April 28, 2023), https://pelosi.house.gov/news/press-releases/pelosi-urges-justice-department-to-help-combat-fentanyl-cartels-bring-operation.

1

## IV.     CONCLUSION

2

For the foregoing reasons, the Court should grant Defendants' Motion.

3

DATED: June 23, 2023                                      Respectfully submitted,

4

BARTKO ZANKEL BUNZEL & MILLER

5

By: _____

6

PATRICK M. RYAN

7

CHAD E. DEVEAUX

CHRISTOPHER W. GRIBBLE

8

TAYLOR YAMAHATA

Attorneys for Defendants

9

COUNTY OF SAN MATEO and

CHRISTINA CORPUS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28